CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 17 2017

JULIA C. DUDLEY CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

KEVIN SNODGRASS,                 )     CASE NO. 7:16CV00091
                                 )
         Plaintiff,              )
                                 )
v.                               )     MEMORANDUM OPINION
                                 )
                                 )
CHRISTOPHER GILBERT, ET AL.,     )
                                 )     By:  Glen E. Conrad
                                 )     Chief United States District Judge
         Defendant(s).           )

Kevin Snodgrass, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging claims against prison officials of conspiracy, retaliation, unconstitutional living conditions, sexual harassment, and due process violations, along with multiple state law claims. Upon review of the record, the court finds that the defendants' motion for summary judgment must be granted in part on the ground of qualified immunity and denied in part on the merits, and that Snodgrass' motion for summary judgment must also be denied.

## I. BACKGROUND

### A. Use of Force Incident

Snodgrass, an inmate at Red Onion State Prison ("Red Onion"), alleges the following sequence of events related to his claims.[1] On September 21, 2015, after two officers searched Snodgrass' cell and placed him back into the cell, defendant Mead came to his cell and told him to "cuff up" to be escorted to prehearing detention as ordered by defendant Gilbert. (Compl. ¶ 28, ECF No. 1.) Snodgrass refused to comply with this order and demanded to see a supervisor. Gilbert came to the cell door and told Snodgrass that he had been charged with a disciplinary

---

[1] This summary of Snodgrass' allegations is taken from his complaint, his motion for preliminary injunction (denied by separate order), his motion for partial summary judgment, exhibits provided to Snodgrass with defendants' motion for summary judgment, his response in opposition to defendants' motion, and his many exhibits, (ECF Nos. 1, 20, 22, 30, and 32). The court makes no finding of fact regarding whether the summarized events actually occurred.

infraction for "having the contents of MASH." (Id. ¶ 29.) Snodgrass, who denies having any "MASH contents," insisted that he was not a segregation inmate who needed to be restrained to leave his cell and volunteered to come out without restraints.[2] (Snodgrass Decl. ¶ 5, ECF No. 30.) When he continued to refuse to comply with cuffing procedures as ordered, Gilbert applied three bursts of OC spray[3] to Snodgrass' facial area.[4] (Compl. ¶ 32; Gilbert Aff. Encl. A, at 6, ECF No. 22-3.) Blinded and "choking" from the spray, Snodgrass then complied with procedures to be restrained. (Compl. ¶ 32.) Snodgrass was decontaminated in the shower and checked by a nurse for complaints of burning eyes, but no other injuries. The nurse said he "could rinse eyes more when placed in cell." (Gilbert Aff. Encl. A.) Thereafter, Gilbert placed Snodgrass in a "strip cell," wearing only his "boxers and socks, with nothing else to wash off the OC spray." (Compl. ¶ 33.)

### B. Sexual Harassment

On September 22, defendant Lewis denied Snodgrass a shower and recreation for no "valid reason," stating: "[A]fter the bullshit you pulled yesterday, you're not going anywhere while you['re] back here[,] and after what you reported on Messer." (Id. ¶ 34.) Lewis threatened that "if you come out that cell in restraints—I'm going to ram something much more up your ass than what Messer was going to." (Id.) When Snodgrass threatened to file a PREA report about

---

[2] At the time this incident occurred, Snodgrass had been classified to Security Level 6 ("SL6"), one stage of the Virginia Department of Corrections ("VDOC") step-down program for inmates determined to require long-term segregated confinement for administrative reasons. (See Operating Procedure ("OP") 830.A, at 84-95, ECF No. 30-1.) SL6 inmates are allowed to leave their cells for ordinary activities such as showers and recreation without being placed in handcuffs and shackles.

[3] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. See, e.g., Park v. Shiflett, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

[4] Gilbert stated on the incident report, and Snodgrass does not deny, that during this confrontation, Snodgrass stated, "F*** you[. C]ome get me[;] I have something for your fat ass." (Counts Aff. Encl. D, at 19, ECF No. 22-2.) Gilbert brought a disciplinary charge against Snodgrass for threatening bodily harm; after Snodgrass appealed, this charge was dismissed.

2

this sexual comment,[5] Lewis said he did not care and continued, "I heard about you filing affidavits for Donnell Blount on me. . . . [Y]ou're a F***in SNITCH." (Id. ¶ 35.) Snodgrass filed a PREA report about Lewis' sexual harassment that was deemed unfounded; Snodgrass complains that he never received a report of the investigation of his PREA report and states that no such investigation occurred.[6] ¶ 79-83

## C. Disciplinary Proceedings

On September 22, an officer served Snodgrass with three disciplinary infractions: possession of intoxicants confiscated from his cell after the shakedown on September 21 (Charge ROSP-2015-1724); disobeying orders to comply with restraint procedures on September 21 (Charge ROSP-2015-1726); and threatening bodily harm against Gilbert on September 21 (Charge ROSP-2015-1725).[7] He was also served with a disciplinary infraction for threatening bodily harm to Lewis on September 22 (Charge ROSP-2015-1727). (Counts Aff. Encl. E, at 32, ECF No. 22-2.)

Defendants Gilbert and Kegley conducted an Institutional Classification Authority ("ICA") review on September 23, allegedly without providing Snodgrass 48 hours prior notice as required by VDOC policies, and placed him on prehearing detention to await the outcome of the pending disciplinary charges. Snodgrass remained on detention status for 35 days without receiving an interim review of that status as required under VDOC policies.

Snodgrass contends that he never received a hearing on the intoxicants charge (ROSP-2015-1724), but was still charged a $5.00 fine for it. Defendants' evidence indicates that

---

[5] A "PREA report" apparently refers to a complaint raised under the VDOC's OP 038.3, titled Prison Rape Elimination Act ("PREA") procedure, adopted in response to a federal law by the same title, 42 U.S.C. §§ 15601-15609. See http://www.vadoc.virginia.gov/about/procedures (last visited March 16, 2017).

[6] Defendants' evidence is that an investigation did occur, and witnesses were interviewed; by letter dated December 7, 2015, investigators advised Snodgrass that his PREA complaint had been deemed unfounded.

[7] Snodgrass asserts that these charges were issued without any prior investigation or witness interviews.

3

Snodgrass accepted a penalty offer for this charge, although he could not sign the offer himself because he did not have his property at that time and had no pen. Snodgrass denies that he accepted a penalty offer. (Snodgrass Decl. ¶ 11, ECF No. 30.)

On September 30, defendant Counts conducted the disciplinary hearings for disobeying an order (ROSP-2015-1726), threatening harm against Gilbert (ROSP-2015-1725), and threatening harm against Lewis (ROSP-2015-1727). Kegley, Snodgrass' assigned staff advisor, did not provide him any assistance. For two of the hearings, Counts denied Snodgrass' requests for documentary evidence and review of video footage. Counts also denied Snodgrass' request for witness statements from other inmates. Counts found Snodgrass guilty of these charges, based on the reporting officer's description of the offense conduct and penalized him with loss of telephone privileges for 60 days for each of the three charges. (Counts Aff. Encl. C, D, and E, at 3, 20, and 33, ECF No. 22-2.)

Snodgrass appealed the findings of guilt. On November 9, 2015, Warden Barksdale dismissed the threat charge (ROSP-2015-1725), but the other charges were upheld. Appeals of the other charges tried on September 30 were unsuccessful. Snodgrass alleges that multiple defendants conspired "to fabricate [all four] charges[, find him guilty without due process], and have [him] housed in segregation unconstitutionally." (Id. ¶¶ 46, 57.)

### D. Long-term Segregation Procedures

Level S ("SLS") inmates are those who must be managed in a long-term segregation setting.[8] Under current policies, once a VDOC inmate is classified as SLS, he may participate in

---

[8] According to the VDOC operating procedure for security level classification, effective on April 1, 2015, inmates are classified to Level S based on "segregation qualifiers," "[e]xcessive violent [d]isciplinary [c]onvictions"; possessing firearms or other weapons; gang activity or leadership; manipulating staff or displaying predatory behavior; or "[b]ehavior that represents a threat level too great for the safety and security of a lower level institution." (See OP 830.2(IV)(G), at 22-31, ECF No. 30-1.)

4

the Segregation Reduction Step-Down Program set out in Operating Procedure ("OP") 830.A. (OP 830.A, at 84-95, ECF No. 30-1.) Effective February 18, 2013, the step-down program is intended to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A, § I.)

Each newly classified SLS inmate is assessed and assigned to the appropriate privilege level: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). (OP 830.A, § III.) An inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (Id.) Inmates are further sub-classified under OP 830.A as follows, from IM-0 or SM-0 as the most restrictive statuses, to Security Level 5 General Population as the least restrictive:

Intensive Management (IM):
IM-0
IM-1
IM-2
IM-SL6
Special Management (SM):
SM-0
SM-1
SM-2
SM-SL6
Step-Down—Level 6 General Population
Structured Living—Phase 1 and Phase 2
Security Level 5 General Population

The step-down program in OP 830.A is a so-called cognitive program that involves meeting pro-social goals and requires the inmate to complete a seven-workbook set called the

Challenge Series, remain infraction free, exhibit responsible behavior, and participate in self-improvement and education programs. When an SM-0 inmate makes sufficient progress toward the goals of that step, he will be advanced to SM-1 or SM-2, where he will be permitted additional privileges, including use of electronics and the chance to apply for an in-pod job. An SM-1 or SM-2 inmate who does not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to SM-1 or SM-0. There, he will remain, stripped of the higher privileges of his prior step until he completes the goals to be advanced once again.

While assigned to any of these segregation levels, the inmate's classification status will be periodically reviewed by the Institutional Classification Authority ("ICA"). Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as cell compliance, personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also to be reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge State Prison ("Wallens Ridge"), by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [SLS] offender's case." (OP 830.A(IV)(K)(1)(a)). This review includes a reassessment of

6

whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned.

All SLS inmates in the IM and SM categories are housed in single cells. When any SLS inmate leaves his cell, he must be restrained in handcuffs and shackles. In full restraints, he is then escorted by two officers at all times to recreation, to the shower, or to medical appointments. Outdoor recreation consists of being locked in a fenced, cage-like area to walk or do calisthenics.

When the SM inmate completes the <u>Challenge Series</u> and meets the goals for SM-2, he may be decreased from SLS to Security Level 6 ("SL6"), a classification level with two phases. Inmates in SM-SL6 Phase 1 are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the <u>Thinking for a Change</u> curriculum with other inmates in groups of up to fifteen participants. Inmates in SM-SL6 Phase 2 have cell mates, are unrestrained for showers and recreation, have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall. If the inmate completes the goals in SL6, he may then be reduced to Security Level 5 and be placed in a general population setting.

E. Snodgrass' Classification Proceedings

Snodgrass contends that OP 830.A is an unconstitutional policy, because inmates receive "no due process" during reviews to determine their progress through this step-down program back to general population status. (<u>Id.</u> ¶ 98.) He complains that his good behavior has become secondary to his compliance with the step-down requirements such that the program prolongs his time in SLS and delays him from regaining a good time earning rate.

7

Defendants Raiford and Kegley conducted a review of Snodgrass' security level and good time earning rate on October 6, 2015, with him present. According to their ICA report, they recommended changing him from SM-SL6 back to SLS, "due to [his security points] in conjunction with poor behavior and adjustment" to SM-SL6. (Snodgrass Exh. C, at 4, ECF No. 30-1.) The report noted that Snodgrass had been moved to SM-SL6 three times since October 2014, only to incur new disciplinary charges and be moved back to SLS; the ICA noted that Snodgrass had received 13 infractions between March 12, 2015, and the date of the hearing, including the charges from September 21 and 22. Defendants Hamilton and Washington reviewed and approved the ICA's October 2015 recommendation, and Snodgrass' security level was changed to SLS. His good time earning rate was also changed to Level 4 (earning no good conduct time). Snodgrass filed grievances and appeals, complaining that these classification reviews and changes were deficient under VDOC policies, but the decisions were upheld.

On October 26, the ICA reviewed Snodgrass for a step-down privilege assignment and recommended placing him in SM-0, and he was moved to SLS housing; the SM-0 recommendation was approved on November 2. Later that month, after one of the three September disciplinary charges was dismissed on appeal, Snodgrass asked officials to consider this fact as grounds to remove him from SLS. He remained at SM-0.

On November 11, 2015, defendant Adams asked Snodgrass if he was going to testify for inmate Blount. Snodgrass did testify on November 19, 2015, in Blount's civil action against defendants Adams, Lewis, Raiford, and other Red Onion officers. The next day, Adams banged on Snodgrass' cell door and threatened that his time in SLS would be longer because he had testified for Blount. When Snodgrass' family visited him on November 25, 2015, defendant Barksdale told them that Snodgrass "needed to worry about himself and stop trying to fight other

8

people['s] battles, because he's only going to make it harder on himself while he's in segregation." (Compl. ¶ 93.) Snodgrass "became very stressed" after hearing his family's report of Barksdale's threat in response to his exercise of free speech rights. Then, Adams saw Snodgrass at the grievance kiosk on November 26 and called him a "F***'n SNITCH!" (Id. ¶ 92.) Snodgrass believes that multiple defendants conspired to retain him longer in SLS status in retaliation for his testimony in Blount's civil case.

On December 2, 2015, defendants Duncan and Swiney conducted an ICA review of Snodgrass, in violation of due process and VDOC policies. They relied on disciplinary infractions outside the applicable review period to reassign him to SM-0.

Snodgrass filed a request on December 3, 2015 to receive the <u>Challenge Series</u> books and attend classes to complete this series as required to progress in the step-down program to leave SLS. An unidentified treatment staff person told him that unspecified defendants had said to "hold off progressing [Snodgrass] through segregation until they see what happens in [Blount's] law suit." (Id. ¶ 97.) For several weeks, Snodgrass was not allowed to start the <u>Challenge Series</u> or attend classes. On December 17, defendant Gallihar threatened that Snodgrass would remain longer in SLS if he continued to "address his housing status" with informal complaints and grievances. (Id. ¶ 109.) Other officers refused Snodgrass' requests for such forms. After Snodgrass filed an informal complaint on January 10, 2016, about a legal mail problem, defendant Gilbert threatened that if Snodgrass kept up "this 'SHIT,' that he'll find a way to house [Snodgrass] as an (IM) (inmate)." (Id. ¶ 118.)

Treatment staff told Snodgrass on January 27, 2016, that he would not receive Book 3 of the <u>Challenge Series</u> until he earned SM-1 status. On January 28, 2016, defendant Swiney told Snodgrass that he would not "advance[e] his Security Level [be]cause of recent law-suits that

[Snodgrass was trying to file] against his officers." (Id. ¶ 114.) On January 29, 2016, defendants Stewart and Gilbert reviewed Snodgrass' SLS status; they did not allow him to present witnesses or documentation, and based on evidence not presented at the hearing, they recommended that he remain at SM-0. This decision was also based, in part, on Snodgrass' failure to complete the appropriate Challenge Series workbook that had been denied to him for more than ninety days. Defendants Gilbert and Hall, at a review on February 3, 2016, determined that Snodgrass should remain at SM-0. When Snodgrass asked a treatment staff member that day if he could attend class, he was told that according to supervisors, he could not attend class while he was SM-0.

On February 4, 2016, defendant Stewart "denied the Security Level Release of [Snodgrass] with threats of fake reports if he continued to Bitch about his Security Level." (Id. ¶ 123.) Later that same day, defendant Gallihar denied Snodgrass SM-1 status "due to 'lack of respect' and [because] the bar was not met." (Id. ¶ 124.) In an informal review on February 26, 2016, Snodgrass was assigned to SM-1 status.

On March 17, 2016, staff conducted a corrective ICA hearing to address issues Snodgrass had raised in a grievance about his December 2 review proceeding.[9] Although the correction included a reduction in Snodgrass' total point score under VDOC classification policies, from 69 to 48, this score was still within the range of an SLS assignment. The ICA recommended that Snodgrass remain assigned to SLS, and the Central Classification Services unit approved that status on March 23. Snodgrass complains that the ICA failed to return his good time earning rate or give him credit for completing the Challenge Series, among other procedural violations. On July 5, 2016, Gilbert "threatened [Snodgrass] with longer confinement and a denial of [SM-2] privileges/status for filing this current law-suit against him and friends. He called [Snodgrass] a

---

[9] The procedural error at issue was that Swiney had made the December 2 classification recommendation and also reviewed and approved that recommendation.

10

'Dumb F***ing N***** who thinks he's a lawyer.'"[10]  (Snodgrass Stmt. of Undisp. Facts,.
¶ 72.)

### F.  SLS Living Conditions

Snodgrass also contends that living conditions in SLS violate the Eighth Amendment.

Specifically, Snodgrass states that he

> was confined for (23) hours a day in a cell, and deprived of most of his personal
> property as well as the ability to work, attend educational and vocational
> programs, watch tel[e]vision, associate with other prisoners, attend outdoor
> recreation in a congregated setting with the ability to participate and engage in
> sports and other congregate recreational activities, attend meals with other
> prisoners, attend religious services, receive contact visitation with family and
> friends, attend to showers on a daily basis, and to communicate with family and
> friends using the telephone.

(Id. ¶ 155.)

### G.  Legal Mail Problems

On November 10, 2015, Snodgrass handed defendant Deel a piece of outgoing mail

addressed to the Wise County Circuit Court.  Deel also signed Snodgrass' money withdrawal

form for postage and agreed to deliver the mail to the mailroom.  In December, Snodgrass

received notice that the court had never received the November 10 mailing.  His requests for

copies of relevant outgoing mail receipts went unanswered.  Finally, in January 2016, Deel

"confirmed that he received the mail and claim[ed] that the documents [were] mailed."  (Id. ¶

126.)  Snodgrass' mailing was never returned to him or received by the court.  He states that he

was unable to proceed with his litigation in Wise County because of the lost mailing.  Snodgrass

also complains that defendant Stewart, on February 22, 2016, refused to process his request form

---

[10]  Snodgrass has filed a motion for reconsideration (ECF No. 32) of the magistrate judge's prior order
(ECF No. 31) denying his motion to compel discovery and his motion for leave to file a supplemental complaint to
add defendants and numerous claims about subsequent events.  Having reviewed the magistrate judge's order, the
court agrees that the supplemental complaint is an attempt at unjustified expansion of this lawsuit and that the
motion to compel was premature until the court has decided the issue of qualified immunity.  See Siegert v. Gilley,
500 U.S. 226 (1991).  Accordingly, the court will deny the motion for reconsideration of these rulings.

seeking a six-month trust account statement from the business office as needed to file this lawsuit.

## H. The § 1983 Complaint

Snodgrass filed his § 1983 complaint in March 2016. After a lengthy recitation of the facts summarized here, he presents fourteen paragraphs stating various legal claims with no stated connection to the events from which these claims allegedly arise. Liberally construed,[11] the complaint alleges the following federal constitutional claims:

1. Defendants Gilbert, Lewis, Kegley, Duncan, Stewart, Raiford, Swiney, Day, Adams, Barksdale, Washington, Hamilton, Still, Gallihar,[12] Clarke, Deel, and Red Onion's mailroom staff retaliated against Snodgrass for his exercise of his First Amendment rights;

2. Defendants Gilbert, Lewis, Kegley, Duncan, Stewart, Raiford, Swiney, Day, Adams, Barksdale, Washington, Hamilton, Still, Gallihar, Clarke, Deel, Red Onion's mailroom staff, Messer, Parr, Ponton, and Maples, each conspired with one or more of the other defendants to violate Snodgrass' constitutional rights.

3. Defendants Gilbert, Messer, Parr, Kegley, Duncan, Stewart, Raiford, Swiney, Day, Adams, Fannin, Counts, Washington, Barksdale, Hamilton, Still, Gallihar, Clarke, Ponton, and Maples deprived Snodgrass of various liberty interests without due process.

4. Defendant Fannin violated Snodgrass' rights under PREA;

5. Defendants Gilbert and Lewis used excessive force against Snodgrass;

6. Defendants Lewis and Fannin sexually harassed Snodgrass;

7. Defendants Raiford, Swiney, Washington, Barksdale, Hamilton, Still, Gallihar, and Clarke subjected Snodgrass to unconstitutional living conditions; and

---

[11] When, as here, the plaintiff is without counsel, he is held to "less stringent standards," and the court must construe his complaint "liberally." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[12] In the complaint and other submissions, Snodgrass refers to this defendant as "Galahart" (see, e.g. Compl. 1), but the court will spell this defendant's name as it appears in defendants' submissions: Gallihar.

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 12 of 36   Pageid#: 495

8. Defendants Barksdale, Deel, and the Red Onion mailroom staff interfered with Snodgrass' right to access the court.

In addition to these federal constitutional claims and interlocking allegations of conspiracy by all the defendants, Snodgrass alleges claims under state tort law, the Virginia Constitution, and VDOC operating procedures. As relief for the alleged violations, he seeks monetary, declaratory, and injunctive relief.

Defendants have filed a motion for summary judgment on the ground of qualified immunity. On that ground, they also filed a motion for a protective order against discovery that the court granted. Snodgrass has responded to defendants' motion on this ground and has also filed a cross motion for summary judgment.

## II. DISCUSSION

### A. Standards of Review

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. See, e.g., Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory assertions unsupported by

factual matter to defeat a motion for summary judgment, however.  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (citation omitted).  Qualified immunity involves a two-step inquiry in no particular order:  determining whether an official is entitled to qualified immunity generally requires a two-step inquiry: "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).  If the court determines that the facts alleged, taken in the light most favorable to the nonmovant, do not show that the officer's conduct violated a constitutional right, then the movant is entitled to summary judgment without further discussion of qualified immunity.  Saucier v Katz, 533 U.S. 194, 201 (2001) (overruled on other grounds by Pearson).

Under the first facet of the qualified immunity analysis, the court inquires whether the complaint and attachments allege "enough facts to state a [constitutional] claim to relief that is plausible on its face."  Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotations omitted).  The court must construe the facts in the light most favorable to the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id. (internal quotations omitted).  Under the second prong of the qualified immunity analysis, "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

## B. Use of Force

Chronologically, Snodgrass first alleges use of excessive force on September 21, 2015, in violation of the Eighth Amendment. The court concludes that the defendants are entitled to summary judgment on the ground of qualified immunity as to this claim.

Only "the unnecessary and wanton infliction of pain" violates the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 321 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010)). Thus, to state a claim that a prison guard used unconstitutional force against him, a plaintiff must state objective facts showing that the force was "nontrivial," Wilkins, 559 U.S. at 39 (2010), and, subjectively, that the official acted "maliciously and sadistically and for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." Whitley, 475 U.S. at 320-321.

Courts must give "wide-ranging deference," Whitley, 475 U.S. at 321-22 (internal quotation marks and citation omitted), to prison administrators "to design and implement policies and practices that in their judgment are necessary for the preservation of order and security" in the inherently dangerous prison environment. Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). Factors relevant to proving malicious or sadistic intent include: (1) the need for force, (2) the degree of force used in relation to the need for force, (3) the existence of a threat reasonably perceived by the official, (4) any efforts made to lessen the severity of a forceful response, and (5) the extent of the prisoner's injury. Id. at 7.

It is well established that prison officials violate the Eighth Amendment when they use pepper spray against an inmate in "quantities greater than necessary or for the sole purpose of infliction of pain." Iko v. Shreve, 535 F.3d 225, 240 (4th Cir. 2008) (omitting citations). On the other hand, many courts have upheld as constitutional the use of pepper spray to regain control

over a recalcitrant inmate after other measures have failed to do so. See, e.g., Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) (finding that use of mace or other chemical substances "when reasonably necessary . . . to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment").

For purposes of this opinion, the court will presume without finding that using three bursts of OC spray in an inmate's facial area, as Gilbert applied to Snodgrass, was more than a nontrivial use of force. Thus, Snodgrass has satisfied the objective facet of the excessive force standard. The court will also accept as true his contention that he never threatened bodily harm to anyone on September 21, 2015. It is undisputed, however, that Snodgrass refused to obey the officers' orders to comply with cuffing procedures.

Snodgrass contends that because he volunteered to leave the cell without restraints, Gilbert's use of OC spray was excessive. This argument has no merit. Snodgrass' stated belief that policy prohibited Gilbert from placing an SL6 inmate in restraints cannot excuse his noncompliance with the officers' orders.[13] Moreover, Snodgrass' continued noncompliance posed a security threat and created a justification for the officers to apply some measure of force to restore discipline. The officers also made efforts to temper the force used. When verbal orders had no effect, Gilbert applied bursts of OC spray until Snodgrass complied with procedures as ordered. Snodgrass alleges no fact on which he could persuade a jury that the use of the spray was a wanton infliction of harm rather than a good faith effort to restore order in light of his admitted disobedience. As he thus fails to state this necessary element of his Eighth Amendment claim regarding the use of force incident, the court concludes that defendants are

---

[13] Snodgrass himself alleges that the officers ordered him to comply with cuffing procedures only after also informing him that he was being charged for contraband found in his cell during an earlier search. He cites no policy prohibiting officers from restraining an inmate being placed in prehearing detention on such a disciplinary charge.

entitled to summary judgment on the ground of qualified immunity. Saucier, 533 U.S. at 201. Snodgrass also fails to show any dispute of material fact here as required to prevail in his own motion for summary judgment on this claim.

### C. Hazardous Living Conditions

Snodgrass alleges that after dousing him with OC spray, defendants placed him on "strip cell" status wearing only boxers and socks and "nothing else to wash off the OC spray." (Compl. ¶ 33.) To the extent that Snodgrass claims that these cell conditions violated his constitutional rights, defendants are entitled to qualified immunity. Saucier, 533 U.S. at 201.

"The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993). Snodgrass simply makes no such showing. He does not allege any harm he suffered from being on strip cell status. Because he fails to show a constitutional conditions claim here, the court will grant defendants' motion for summary judgment on the ground of qualified immunity and deny Snodgrass' motion as to this claim.

### D. Sexual Harassment and PREA

Snodgrass alleges that Lewis sexually harassed him by making the offensive remark on September 22, 2015, and that Fannin's subsequent investigation was inadequate under PREA. Snodgrass asserts that in so doing, both defendants violated the Eighth Amendment and that Fannin is liable to him for PREA violations. The court finds no cognizable federal claim arising from these allegations.

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 17 of 36   Pageid#: 500

"The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (omitting citations). Numerous courts, including this one, have held that "sexual abuse by a prison guard on an inmate may violate the Eighth Amendment." Chapman v. Willis, No. 7:12-CV-00389, 2013 WL 2322947, at *4 (W.D. Va. May 28, 2013) (Kiser, J.) (citing other cases). However, courts have also recognized that not all alleged incidents of sexual harassment are "objectively, sufficiently serious" to constitute a violation of the Eighth Amendment. Id. (citing other cases, including Boddie v. Schnieder. 105 F.3d 857, 861 (2d Cir. 1997) ("[I]solated episodes of harassment and touching . . . are despicable. . . . But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.") (citing Farmer v. Brennan, 511 U.S. 825, 833-34 (1994)). Moreover, "[w]ords by themselves do not state a constitutional claim, without regard to their nature." Morrison v. Martin, 755 F. Supp. 683, 687 (E.D.N.C.)), aff'd, 917 F.2d 1302 (4th Cir. 1990) (unpublished). Mere allegations of verbal abuse and harassment by guards cannot state any constitutional claim. See Henslee v. Lewis, 153 Fed. App'x 178, 180 (4th Cir. 2005) (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)). It follows that without some evidence that the defendant's alleged sexual abuse involved touching and inflicted pain, a complaint of sexual harassment against a prison guard does not reach constitutional proportions. See, e.g., Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir. 1997) ("To prevail on a constitutional claim of sexual harassment, an inmate must therefore prove, as an objective matter, that the alleged abuse or harassment caused 'pain' and, as a subjective matter, that the officer in question acted with a sufficiently culpable state of mind."); Chambliss v. Jones, No 14-2435, 2015 WL 328064, at *3 (M.D. Pa. Jan. 26, 2015) ("sexual

18

harassment in the absence of contact or touching does not establish excessive and unprovoked pain infliction" as required to state a claim for a constitutional violation).

The comment that Lewis allegedly made to Snodgrass was inappropriately sexual and unprofessional. Those words alone, however, did not constitute punishment or a constitutional violation, and Snodgrass does not allege that Lewis touched him or caused him any measure of pain. Snodgrass does not allege that Fannin took <u>any</u> sexually offense action against him. Thus, the court is satisfied that the allegations against Lewis and Fannin, even if proven true at trial, do not rise to the level of an Eighth Amendment violation.

Snodgrass also has no actionable federal claim against Fannin under PREA. This court and others have found no basis in law for a private cause of action under § 1983 to enforce an alleged violation of PREA. <u>See, e.g.</u>, <u>Chapman</u>, 2013 WL 2322947, at *4; <u>Berry v. Eagleton</u>, No. 13-2379, 2014 WL 4273314 at * 10 (D.S.C, Aug. 29, 2014) (citing other cases).

> "The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. . . . The statute does not grant prisoners any specific rights." <u>Chinnici v. Edwards</u>, No. 1:07-cv-229, 2008 U.S. Dist. LEXIS 119933, 2008 WL 3851294, at *3 (D. Vt. Aug.13, 2008). Thus, Plaintiff fails to state a § 1983 claim based on an alleged violation of the PREA.

<u>Chapman</u>, 2013 WL 2322947, at *4. The court adopts the reasoning of these cases and concludes that, as a matter of law, Snodgrass cannot pursue a § 1983 claim based on Fannin's alleged failure to comply with state investigative procedures implemented because of PREA.

For the stated reasons, as to Snodgrass' attempted claims of sexual harassment and related PREA violations, the court will grant defendants' motion for summary judgment on the ground of qualified immunity. <u>Saucier</u>, 533 U.S. at 201. Finding no disputed fact on which Snodgrass could prevail here, the court will deny his motion for summary judgment on these claims.

19

E.  Due Process

Snodgrass asserts that defendants have committed numerous due process violations:  by bringing false disciplinary charges against him, by failing to provide him a hearing, or by failing to provide adequate notice, witnesses, documentation, and video review during disciplinary hearings and appeals or during classification reviews.  Snodgrass is missing the same key ingredient for his due process claims in this action:  he provides no facts showing that he had a constitutionally protected liberty interest at stake in the challenged proceedings.  Because he fails to state facts supporting the elements of a due process claim, defendants are entitled to summary judgment on the ground of qualified immunity.  Saucier, 533 U.S. at 201.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  "To state a procedural due process violation,[14] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law."  Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015).  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Snodgrass does not have an inherent, constitutionally protected liberty interest in avoiding penalties for prison disciplinary infractions.  Wolff v. McDonnell, 418 U.S. 539, 556-57 (1974).  ("[T]he interest of prisoners in disciplinary procedures is not included in that 'liberty' protected by the Fourteenth Amendment.").  A state-created liberty interest may

---

[14]  Snodgrass alleges that defendants have violated his "substantial [and] procedural Due Process rights." (Compl. ¶ 131) (emphasis added).  His apparent attempt to state a substantive due process claim fails, however.  It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause."  Whitley, 475 U.S. at 327.

exist, however, if Snodgrass (a) points to "a basis for an interest or expectation in state regulations" in avoiding a particular penalty, Prieto, 780 F.3d at 250; and (b) shows that the penalty "impose[d] atypical and significant hardship . . . in relation to the ordinary incidents of prison life," or will "inevitably affect the duration" of his confinement." Sandin v. Connor, 515 U.S. 472, 484, 487 (1995). Only if Snodgrass makes these showings does the Due Process Clause require a particular measure of procedural protection. Id.

### 1. Disciplinary Proceedings

Snodgrass claims due process violations related to all of the disciplinary charges at issue in this lawsuit. The court concludes that defendants are entitled to qualified immunity as to all of these claims.

As to the September 21 charge for possessing intoxicants, defendants' evidence is that Snodgrass essentially pleaded guilty, by accepting a penalty offer of a $5.00 fine. Snodgrass denies that he did so, claiming that the penalty offer document is fabricated and that he was deprived of $5.00 without any predeprivation hearing. Such an allegedly "unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). The court takes judicial notice of the fact that the VDOC's disciplinary procedure provides for such a postdeprivation remedy: if an inmate believes he has been wrongfully penalized under a penalty offer document that he did not actually accept, he has a right to appeal. See OP 861.1(XVIII)(A) ("An offender has the right to appeal any finding of guilt, and/or degree of punishment imposed, to the Facility Unit Head where the offense occurred via the Disciplinary Appeal."). See http://www.vadoc.virginia.gov/about/procedures (Last visited,

March 14, 2017).  Because Snodgrass has not shown that he was without a constitutionally sufficient postdeprivation remedy for the allegedly unlawful $5.00 penalty, see Wilkinson, 545 U.S. at 224-25, the court concludes that he fails to present a viable § 1983 due process claim related to the intoxicants charge.

For the September 21 charges of disobeying a direct order and threatening bodily harm, Snodgrass was penalized by the loss of telephone privileges for 60 days; he received the same penalty for the September 22 charge of threatening bodily harm to Lewis.  Since these penalties did not involve any loss of property, the court presumes that Snodgrass is arguing for a federally protected liberty interest here.  This argument fails, however.

Snodgrass insists that dismissal of the September 21 threat charge on appeal proves that the charge itself was fabricated, a deprivation of due process.  He is mistaken.  Even a false disciplinary charge by itself does not violate an inmate's right to due process, if he is thereafter provided with notice and a hearing on that charge.  See Freeman v. Rideout, 808 F.2d 949, 952-53 (2d Cir. 1986) (finding "the mere filing of [a false] charge itself" does not constitute a cognizable claim under § 1983 if the inmate "was granted a hearing, and had the opportunity to rebut the unfounded or false charges").  Therefore, Snodgrass has no separate § 1983 claim against Gilbert for bringing the disciplinary charge.  Moreover, the dismissal of the charge on appeal is fatal to his due process claim.  Indeed, the appeal procedure served its intended function as a further procedural protection against an erroneous deprivation of telephone privileges, and dismissal of the charge mooted any earlier procedural defects.

Furthermore, Snodgrass has not proven that he had any federally protected interest at stake.  Because "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," use of a temporary withholding of privileges as "[d]iscipline by

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 22 of 36   Pageid#: 505

prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 486 (internal quotation marks and citations omitted). Thus, Snodgrass' loss of telephone privileges for a time was not the type of atypical hardship required to create a liberty interest that would trigger federal due process protections under the rubric in Sandin. Nor has Snodgrass shown that the penalties imposed on him inevitably affected the length of his confinement so as to trigger a protected liberty interest. Id. at 487. Without stating facts to establish a federal liberty interest involved in the challenged disciplinary proceedings, Snodgrass has stated no actionable claim that he was deprived of a federal right to any particular procedural protections in these disciplinary proceedings.

Snodgrass also has no § 1983 claim that defendants allegedly failed to provide him all the procedural protections required under VDOC procedures, such as witness statements, documentation, and pre-hearing notice. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983. Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For these reasons, Snodgrass' submissions fail to state any § 1983 due process claim related to the disciplinary hearings on the September 21 and 22, 2015 charges. Thus, defendants are entitled to summary judgment on the ground of qualified immunity, Saucier, 533 U.S. at 201, and Snodgrass' motion for summary judgment must be denied.

### 2. Security Level S and the Step-down Program

Snodgrass alleges that defendants placed him in SLS confinement and reviewed his progress in the step-down program without sufficient procedural due process protections. As to

23

various classification proceedings over several months, Snodgrass claims he did not receive appropriate notice, the ability to present documentation and witnesses, the chance to argue his position, and a detailed and/or written statement of the reasons for classification decisions. Again, Snodgrass is missing the critical ingredient for his due process claims concerning classification proceedings: he provides no facts showing that he had a constitutionally protected liberty interest at stake.

A state prison's policy requiring periodic classification reviews for segregation inmates can create a potential liberty interest. See, e.g., Incumaa v. Stirling, 791 F.3d 517, 527 (4th Cir. 2015). This court has held that the VDOC's policy requiring that the ICA perform periodic reviews of each SLS inmate, as required in OP 830.2(IV)(G)(7), creates an interest in avoiding or being removed from the SLS classification, its conditions and restrictions. See, e.g., Delk v. Younce, No. 7:14CV00643, 2016 WL 1298389, at *6 (W.D. Va. Mar. 31, 2016). Snodgrass' liberty interest related to SLS and its steps can only warrant constitutional procedural protection, however, if his continued confinement in SLS imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." Sandin, 515 U.S. at 484. This court has previously rejected precisely this claim. See, e.g., Muhammad v. Mathena, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) (finding no constitutionally protected liberty interest in avoiding SLS status or any particular step status under Red Onion's step-down procedures) (Conrad, J.); DePaola v. Va. Dep't of Corr., No. 7:14cv00692, 2016 WL 5415903 (W.D. Va. Sept. 28, 2016) (same) (Jones, J.). Based on the reasoning in these decisions, as summarized here, the court concludes that Snodgrass has not shown a constitutionally protected liberty interest in avoiding SLS status or any of its steps.

24

It is well established that a temporary assignment to segregated confinement—thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures—is <u>not</u> atypical or a significant hardship. <u>See</u> <u>Sandin</u>, 515 U.S. at 485-86; <u>Beverati v. Smith</u>, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under <u>Sandin</u>). Supreme Court precedent also mandates minimal court involvement "in the day-to-day management of prisons," requiring deference to the expertise of prison administrators in crafting procedures to maintain security and safety for their constituents and the public. <u>Wilkinson</u>, 545 U.S. at 222 (citing <u>Sandin</u>, 515 U.S. at 482-83). Thus, the Supreme Court in <u>Wilkinson</u> and the Fourth Circuit in <u>Incumaa</u> found that conditions in segregated confinement triggered constitutional procedural protection when they extinguished eligibility for parole and were extremely isolating, of indefinite duration, and without defined criteria for eligibility to transfer to less restrictive conditions.[15]

Conditions of confinement in the VDOC's "special housing" units, including SLS, are highly restrictive. SLS inmates, particularly those in IM-0 or SM-0, face single-cell assignment, little face-to-face contact with other inmates, and limited freedom of movement and privacy. The mere existence of these undesirable conditions for SLS inmates at Red Onion, however,

---

[15] The Supreme Court in <u>Wilkinson</u> found that the segregated "supermax" inmates in that case were "deprived of almost any environmental or sensory stimuli and of almost all human contact," 545 U.S. at 214; they were assigned to supermax status for "an indefinite period of time, limited only by [the] inmate's sentence." <u>id.</u>; and "[i]nmates otherwise eligible for parole los[t] their eligibility while incarcerated" at the supermax, <u>id.</u> at 215. The Court held: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." <u>Id.</u> at 224. Similarly, in <u>Incumaa</u>, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax prison based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32.

The prison policies in these cases provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there," <u>Wilkinson</u>, 545 U.S. at 215, because they provided for infrequent review of the continued appropriateness of an inmate's specific segregation status and offered no clear criteria for him to become suitable for release from the supermax. <u>Incumaa</u>, 791 F.3d at 522-23. Authorities repeatedly recommended the inmates' retention at the supermax without providing any behavioral basis for doing so. <u>See id.</u> at 521-23.

25

does not render their confinement atypical or significantly harsh, because VDOC general population inmates can expect temporary terms in segregated confinement under similar restrictions. See Sandin, 515 U.S. at 486 (thirty days); Beverati, 120 F.3d at 504 (six months). Moreover, in many other ways, living conditions in SLS approximate conditions for general population inmates. Snodgrass does not claim that he was denied access to food, hygiene and legal materials, telephone usage (except as a temporary disciplinary penalty), legal counsel, medical and mental health care, library books, commissary items, ingoing and outgoing mail services, possession of some personal property items in his cell, including religious materials, laundry services, and visitation opportunities. Moreover, Snodgrass does not allege facts suggesting that he was subjected to the sort of prolonged, extreme deprivation of sensory stimuli or social contact that gave rise to the concerns in Wilkinson, 545 U.S. at 214. Among other things, Snodgrass' allegations indicate that he was able to converse with officers on a regular basis.

Most importantly, Snodgrass' confinement at SM-0, under the most restrictive conditions for SLS inmates, is not indefinite. VDOC policy requires review of each inmate's SLS status every 90 days, and the evidence is that Snodgrass has received such reviews at similar intervals. The step-down policy defines actions Snodgrass can take to be considered for status changes to greater privileges and less restrictive conditions: participating in the step-down programming, changing his behavior and thinking through the cognitive Challenge Program, and remaining infraction free.

After careful review of his allegations and submissions, the court concludes that the VDOC's policies do not create a constitutionally protected liberty interest in avoiding SLS status or any particular pathway or step within that status. Specifically, the court concludes that the

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 26 of 36   Pageid#: 509

step-down procedures available to SLS inmates address and alleviate the isolating conditions and indefiniteness identified in Wilkinson and Incumaa as distinguishing factors of "atypical and significant" hardships in a long-term segregation scheme.

Furthermore, Snodgrass' submissions do not indicate that his position on the SM pathway has any inevitable effect on the length of his confinement so as to trigger a constitutionally protected liberty interest. Sandin, 515 U.S. at 487. Nothing in the SLS policies before the court indicates that assignment to this status terminates an inmate's eligibility to earn good conduct time. Snodgrass' submissions indicate that he lost his ability to earn good conduct time in October 2015, based on his own disciplinary record, not merely because his classification status changed from SM-SL6 back to SLS and SM-0 status.

For the reasons stated, the court finds that Snodgrass has failed to present facts showing that he has a constitutionally protected liberty interest in avoiding classification to SLS or assignment or reassignment to a particular privilege level under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification assignment and review proceedings.[16] Sandin, 515 U.S. at 486-87.

As in the context of his disciplinary proceedings, Snodgrass also has no claim under § 1983 that any of the defendants have omitted, misconstrued, or misapplied VDOC classification procedures or that procedures during pathway or step assignments and reviews are inconsistent with other VDOC policies. These alleged violations of state procedural regulations do not present a federal due process issue, and are, therefore, not actionable under § 1983. Riccio, 907 F.2d at 1469.

---

[16] In any event, even if Snodgrass could show that SLS and SM pathway conditions are atypical, the court concludes that the multi-level formal and informal status reviews provided regularly to Snodgrass substantially mirror the procedures found to be constitutionally adequate in Wilkinson. 545 U.S. at 224-29.

Because Snodgrass' submissions do not give rise to any federal due process claim related to the challenged classification procedures, the court concludes that defendants are entitled to qualified immunity, see Saucier, 533 U.S. at 201, and will grant their motion for summary judgment on this ground as to such claims. The court will also deny Snodgrass' motion for summary judgment as to these same claims, finding no material dispute on which he could prevail.

## F. Segregation Living Conditions

Snodgrass complains that the conditions in SLS confinement are unconstitutionally harsh. His allegations fail to rise to constitutional proportions, however. He merely complains that he has fewer privileges and less freedom of movement while in SLS confinement. He does not allege that he was deprived of the necessities of life, such as food, shelter, clothing, and medical care. Farmer, 511 U.S. at 834. He also does not allege that the specific conditions or restrictions in SLS or SM-0 status have caused, or are likely to cause, him any serious or significant physical or mental injury. Id.; Strickler, 989 F.2d at 1381 (requiring showing of "serious or significant" injury for conditions claim). Accordingly, Snodgrass fails to state any Eighth Amendment claim concerning segregation living conditions, and defendants are entitled to summary judgment on the ground of qualified immunity. Saucier, 533 U.S. at 201. As Snodgrass has not stated any Eighth Amendment claim here, the court will deny his motion for summary judgment as to this conditions claim.

## G. Access to Courts

Snodgrass complains that legal documents he gave to defendant Deel in November 2015 for mailing to the Wise County Circuit Court never reached their destination. As a result, his

attempted lawsuit in that court did not go forward. Snodgrass now wishes to recover monetary damages for this loss from Deel, unspecified mailroom staff, and the warden.

While inmates enjoy a limited right to access the courts, prison officials may impose restrictions on inmates' access to available legal materials and services, so long as those restrictions are reasonably related to penological interests. Lewis v. Casey, 518 U.S. 343, 361 (1996). For example, the VDOC can reasonably require segregation inmates to send mailings to a court by entrusting them to prison officials for attachment of postage and delivery to the postal service. Inevitably, such prison restrictions may cause inmates to experience delays in mailing court documents or even occasional losses of such mailings, either at the prison or in the outside mail delivery process. Where the regulations themselves are reasonably related to legitimate penological interests, however, their interference with an inmate's right to access the court is "not of constitutional significance, even where they result in actual injury" to the inmate's litigation efforts. Id. at 362. Moreover, an inmate cannot recover monetary damages for a thwarted litigation effort without showing specifically that he had a viable legal claim and suffered measurable harm by being shut out of court. Id. at 351-53; Christopher v. Harbury, 536 U.S. 403, 415-16 (2002). An official's merely negligent actions that cause harm to an inmate's lawsuit attempt also do not support a constitutional claim for denial of access to courts. Pink v. Lester, 52 F.3d 73, 75 (4th Cir. 1995).

Snodgrass alleges, at most, negligence by Deel and/or members of the mailroom staff. He states no facts suggesting any intentional effort to mishandle his mail or prevent it from reaching the court. Moreover, he does not identify the type of the claim he was attempting to litigate or what loss he suffered from having the state court dismiss this attempted case without prejudice. The court concludes that Snodgrass' submissions state no actionable constitutional

claim of denial of access to the courts. Therefore, the court concludes that defendants are entitled to qualified immunity. Saucier, 533 U.S. at 201. As to this claim, the court will grant their summary judgment motion on that ground, and deny Snodgrass' motion.[17]

### H. First Amendment and Retaliation

"Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." American Civil Liberties Union v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993) (citation omitted). Because many actions by prison officials are "by definition 'retaliatory' in the sense that [they are in] respon[se] to prisoner misconduct" or conduct, a prisoner's claims of retaliation must be approached with skepticism. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Adams v. Rice, 40 F.3d 72, 74 (4th Cir.1994). "To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999).

Snodgrass' written and verbal grievances to prison officials about his living conditions do not represent an exercise of a constitutionally protected right. Inmates do not have a constitutional right of access to a grievance process or to file PREA reports. Adams, 40 F.3d at 75; Chapman, 2013 WL 2322947, at *4. Thus, contrary to Snodgrass' assertions, his "mere expressions of dissatisfaction were not constitutionally protected" for purposes of a § 1983 claim

---

[17] The court will also summarily dismiss Snodgrass' lawsuit as to "Red Onion's mailroom staff," pursuant to 28 U.S.C. § 1915A(b)(1), as legally frivolous. This group cannot qualify as a "person" subject to suit under § 1983. See West v. Atkins, 487 U.S. 42, 48 (1988) (holding § 1983 claim requires showing that the plaintiff suffered "the violation of a right secured by the Constitution and laws of the United States, and . . . that the alleged deprivation was committed by a person acting under color of state law") (emphasis added).

of retaliation.[18]  See, e.g., Daye v. Rubenstein, 417 F. App'x 317, 319 (4th Cir. 2011). Consequently, defendants' alleged verbal threats that Snodgrass' grievances would lengthen his stay in SLS, or result in his assignment to the IM pathway, do not support a viable § 1983 claim. Similarly, Lewis' alleged refusal to provide showers and his "snitch" comment after Snodgrass threatened to file a PREA report cannot support a § 1983 retaliation claim, because filing a PREA report is not a constitutionally protected right.[19]

Other official actions that Snodgrass points to as retaliatory are simply too conclusory or not adverse enough to support a claim.  See Adams, 40 F.3d at 74 (holding that conclusory allegations of retaliation do not support § 1983 claim).  An officials' retaliatory action that causes nothing more than a mere inconvenience to the plaintiff's exercise of his constitutional rights is not sufficient to support a § 1983 claim.  Wicomico County, 999 F.2d at 785-86. "Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation.  Thus, a showing of adversity is essential to any retaliation claim."  Id. at 785 (citation omitted).  For example, Snodgrass has not shown that Stewart's alleged refusal to process paperwork for this lawsuit caused anything more than a slight delay in filing suit.  Stewart's action simply does not rise to constitutional proportions.

---

[18]  Put another way, Snodgrass' verbal complaints about his situation are not protected under the First Amendment in this context.  A claim of retaliation for exercise of the First Amendment right to free speech requires "that the expressions which are alleged to have provoked the retaliatory action relate to matters of public concern." Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990) (citation omitted).  "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir.2007) (internal citation and quotations omitted).  On the other hand, statements that merely air "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" are not entitled to First Amendment protection and thus cannot support a § 1983 retaliation claim.  Harrison v. Owens, No. CIV.A. 8:11-2215-MGL, 2014 WL 3101266, at *5 (D.S.C. July 7, 2014), aff'd, 611 F. App'x 151 (4th Cir. 2015) (quoting Stroman v. Colleton Cnty. School Dist., 981 F.2d 152, 156 (4th Cir.1992)).

[19]  As stated, a guard's verbal harassment also is not sufficient to support an independent constitutional claim.  Henslee, 153 Fed. App'x at 180).

The court cannot conclude, however, that defendants are entitled to qualified immunity at this stage of the litigation as to all of Snodgrass' allegations of retaliation. His allegations that some defendants have taken retaliatory actions against him expressly based on his litigation efforts give the court pause.

> Retaliation against an inmate for the exercise of his First Amendment right of access to the courts can support a claim for relief under § 1983. A plaintiff's assertion that the retaliatory act was taken in response to the exercise of a constitutionally protected right, when supported by specific facts, is sufficient to state a retaliation claim. The facts alleged must warrant concern that the claimed retaliation was intended to have a chilling effect on the exercise of the plaintiff's right to access the courts. The prisoner need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the prisoner's right of access to the courts and was reasonably calculated to have that effect.

Thompson v. Clarke, 633 F. App'x 207, 208 (4th Cir. 2016) (internal citations omitted).

Specifically, Snodgrass' submissions allege the following events in support of his claim that defendants retaliated against him for his litigation activities: on September 22, 2015, Lewis called Snodgrass a "snitch" for giving Blount an affidavit for his case; on November 20, Adams threatened Snodgrass that because of his testimony at Blount's trial the previous day, his time in SLS status would be longer; on November 25, Warden Barksdale told Snodgrass' family members that "trying to fight other people['s] battles" would "make it harder" on him in segregation (Compl. ¶ 93); on November 26, Adams again called Snodgrass a "snitch"; in December, an official said some supervisory defendants had directed staff to "hold off progressing [Snodgrass] through segregation until they see what happens in [Blount's] law suit" (id. ¶ 97.); on January 28, 2016, Swiney told Snodgrass that he would not "advance[e] his Security Level [be]cause of recent law-suits that [Snodgrass was trying to file] against his officers" (id. ¶ 114); and on July 5, 2016, Gilbert "threatened [Snodgrass] with longer confinement and a denial of [SM-2] privileges/status for filing this current law-suit against him

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 32 of 36   Pageid#: 515

and friends." (Snodgrass Decl. ¶ 72.)  Snodgrass complains that since December 2015, he has often been denied the opportunity to work on the Challenge Series as required to progress promptly through the step-down program.  He also complains that he has been stalled at SM-1 for months in 2016.

Liberally construing this chronology of alleged events, the court concludes that Snodgrass has alleged facts stating a possible claim that a group of defendants has acted in coordination with each other with an intention to delay his progress through the step-down program, to retaliate against him for his testimony in Blount's civil action, and his pursuit of this or other civil actions.  In addition, he has alleged facts suggesting that such a delay of his step-down progress was reasonably designed to punish him unlawfully for his legal activities and to chill his future exercise of his right to access the courts.  Thus, this claim survives defendants' qualified immunity defense.  Defendants expressly state that inmate litigation and testimony against officers is commonplace and that they do not take retaliatory actions against inmates involved in lawsuits.  Because genuine issues of material fact remain in dispute here, the court must deny defendants' and Snodgrass' motions for summary judgment on this one retaliation claim against the following defendants:  Raiford, Kegley, Washington, Adams, Barksdale, Hamilton, Swiney, Gilbert, Duncan, Stewart, Still, Ponton, and Gallihar (See ¶¶ 91-93, 96-97, 100-101, 105, 108-109, 113-16, 121, and 158.)  However, as to all of Snodgrass' other retaliation claims against all defendants, the court will grant defendants' motion on the ground of qualified immunity. Saucier, 533 U.S. at 201.

### I. Conspiracy

To establish a civil conspiracy claim actionable under § 1983, a plaintiff must demonstrate that the defendants "acted jointly in concert and that some overt act was done in

33

furtherance of the conspiracy," resulting in deprivation of a federal right. Glassman v. Arlington Cnty., Va., 628 F.3d 140, 150 (4th Cir. 2010) (quoting Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996)). A plaintiff must make specific allegations that reasonably lead to the inferences that members of the alleged conspiracy shared the same conspiratorial objective to try to "accomplish a common and unlawful plan" to violate the plaintiff's federal rights. Hinkle, 81 F.3d at 421. As such, a complaint's allegations must amount to more than "rank speculation and conjecture," especially when the actions are capable of innocent interpretation. Id. at 422. Merely labeling a chronological series of actions by multiple individuals as "conspiracy" or reciting the legal elements of conspiracy is not sufficient. Nemet Chevrolet Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

The majority of Snodgrass' conspiracy claims are mere conjecture about coincidental series of events. For example, he alleges that various groups of defendants conspired to find him guilty of disciplinary charges in order to place him in SLS and reduce his good time earning rate to zero, conspired to deny him grievance forms; or conspired to fabricate new disciplinary charges to have Snodgrass moved to the IM pathway. As to these claims, he fails to state facts showing any common plan or intention to violate his federal rights.

Moreover, Snodgrass' complaint fails to state any other claim that prison officials have violated his constitutional rights as alleged, other than the one possible retaliation claim discussed above. Without a constitutional violation at issue, these conspiracy claims also fail. Therefore, the court will grant defendants' motion for summary judgment on the ground of qualified immunity as to all of Snodgrass' conspiracy claims except his claim of conspiracy related to the one retaliation claim against the group of defendants already noted. As to this one

Case 7:16-cv-00091-GEC-PMS   Document 33   Filed 03/17/17   Page 34 of 36   Pageid#: 517

conspiracy claim, finding genuine issues of material fact remain in dispute, the court will deny both motions for summary judgment.

### J. State Law Claims

In addition to his constitutional claims, Snodgrass asserts numerous claims under state laws and regulations. Section 1983 was intended to protect only federal rights guaranteed by federal law, however. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Snodgrass' state law claims are thus not independently actionable under § 1983. Moreover, his state law claims consist merely of labels, with no clear connection regarding particular sets of facts or argument in support of any such claim explaining how its elements are different than the federal rights being litigated.[20] See Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) ("Principles requiring generous construction of pro se complaints are not, however, without limits. . . . District judges are not mind readers. Even in the case of pro se litigants, they cannot be expected to construct full blown claims from sentence fragments. . . .").

Most importantly, the majority of Snodgrass' multiple state law theories of relief have no clear relationship to the remaining claims of conspiracy to delay his progress in the step-down program in retaliation for his exercise of his federal constitutional right to access the court. As such, to avoid a potential for further development and analysis of his disparate and conclusory state law claims to substantially predominate over, or impede the efficient disposition of, the narrow, remaining federal claims, the court declines to exercise supplemental jurisdiction over any state law claims in this action. See 28 U.S.C. § 1367(c)(2), (3) (authorizing court to decline supplemental jurisdiction where state law claims would substantially predominate over original

---

[20] The state law claims allege generally that various defendants violated Snodgrass' rights under numerous provisions, including: Article 1, sections (9), (11), and (12) of the Virginia Constitution, violations of VDOC regulations, and many state law tort claims, including gross negligence, conspiracy and retaliation, procedural and "substantial" due process, emotional distress, supervisor liability, cruel and unusual punishment, deliberate indifference, and verbal harassment.

jurisdiction claims or where original jurisdiction claims have been dismissed). Therefore, the court will dismiss all of Snodgrass' state law claims without prejudice.

## III. CONCLUSION

For the reasons stated, the court concludes that defendants are entitled to summary judgment on the ground of qualified immunity as to all of Snodgrass' federal claims against all defendants except: his claims that the following defendants <u>conspired</u> to delay his progress through the step-down program in <u>retaliation</u> for his exercise of the right to access the courts. As to these two limited and closely related claims, the court finds genuine issues of material fact in dispute that preclude summary judgment on the ground of qualified immunity or the merits. Thus, the court will grant defendants' motion on the ground of qualified immunity as to most claims and defendants, but will deny the motion in its entirety as to the noted retaliation/conspiracy claims. Second, the court will also deny Snodgrass' motion for summary judgment. Third, the court will summarily dismiss Snodgrass' claims under state law without prejudice and summarily dismiss without prejudice as frivolous his claims against the Red Onion mailroom staff. <u>See</u> 28 U.S.C. § 1367(c); 1915A(b)(1). Finally, because no party has invoked the right to a jury trial, the court will refer the remaining conspiracy/retaliation claims to the United States Magistrate Judge to conduct further proceedings and recommend appropriate disposition. An appropriate order will enter this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to the parties.

ENTER: This 17th day of March, 2017.

_____
Chief United States District Judge

36