CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 26, 2024
LAURA A. AUSTIN, CLERK
BY:
/s/T. Taylor
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **KEVIN SNODGRASS, JR.,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:16cv00091 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **CHRISTOPHER GILBERT, et al.,** | ) | |
| Defendants | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

The plaintiff, Kevin Snodgrass, Jr., ("Snodgrass"), an inmate previously incarcerated at Red Onion State Prison, ("Red Onion"), brought this civil rights action pursuant to 42 U.S.C. § 1983, against multiple Virginia Department of Corrections, ("VDOC"), employees. Included among these claims, Snodgrass alleged that various of the defendants violated his First Amendment rights by retaliating against him for filing a lawsuit, testifying in another inmate's lawsuit and filing complaints and grievances. On referral from the District Judge, the undersigned held two bench trials and entered two Reports and Recommendations, both of which were adopted by the District Judge, who entered judgment in the defendants' favor on the claims. Snodgrass appealed, and the Court of Appeals has remanded his retaliation claims to this court for reconsideration in light of the Court of Appeals' decision in *Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020). On remand, the case was transferred to the undersigned based on the parties' consent pursuant to 28 U.S.C. § 636(c)(1). The parties have fully briefed the issue, and no party has requested further hearing or to present further evidence.

*I. Facts*

In his Complaint, Snodgrass alleged that the defendants – Walter Swiney, Garry Adams, David A. Still, Christopher Gilbert, E. R. Barksdale, John Hamilton and A. Gallihar[1] – violated his First Amendment rights by conspiring to extend his stay in long-term segregation by delaying his progress through the Step-Down Program in retaliation for his testimony for fellow inmate Donnell Blount. (Complaint, Docket Item No. 1, at 14.) The Complaint also alleged a general First Amendment retaliation claim against all remaining defendants – Gilbert, Reanne Kegley, Amee Duncan, Tori Raiford, Swiney, Adams, Barksdale, John Hamilton, Gerald Washington, Still, Gallihar, Henry Ponton and Kelly M. Stewart. (Complaint at 18-20.) By Memorandum Opinion entered on March 17, 2017,[2] the court construed Snodgrass's Complaint as alleging a viable First Amendment retaliation claim against defendants Raiford, Kegley, Washington, Adams, Barksdale, Hamilton, Swiney, Gilbert, Duncan, Stewart, Still, Ponton and Gallihar for delaying his progress through the Step-Down Program because of his testimony for Blount and filing lawsuits. (Docket Item No. 33 at 33.) The undersigned conducted a bench trial on this claim on August 23-24, 2017, and entered a Report and Recommendation recommending entry of judgment in the defendants' favor. (Docket Item No. 80.) By Memorandum Opinion and Order entered on April 26, 2018, the district court overruled the plaintiff's objections and adopted the Report and Recommendation in its entirety. (Docket Item Nos. 86, 87.) This Order recommitted the case to the undersigned to determine plaintiff's claim that Gallihar, Gilbert and Stewart delayed his progress through the Step-Down Program in

---

[1] Defendant Gallihar's surname is misspelled "Galahart" in the Complaint.

[2] This Memorandum Opinion and Order entered on March 17, 2017, dismissed all other claims and all other defendants.

retaliation for exercise of Snodgrass's First Amendment right to petition by filing informal complaints and grievances. The undersigned conducted a second bench trial on this claim on July 17, 2018. By Report and Recommendation entered on October 25, 2018, the undersigned recommended entry of judgment in favor of the defendants on that claim. (Docket Item No. 110.) By Memorandum Opinion and Order entered December 17, 2018, the district court overruled the plaintiff's objections and adopted the Report and Recommendation in its entirety. (Docket Item Nos. 112, 113.) On appeal, the Fourth Circuit remanded these claims.

Thus, the court has before it two First Amendment retaliation claims for consideration. The first is Snodgrass's claim that defendants Raiford, Kegley, Washington, Adams, Barksdale, Hamilton, Swiney, Gilbert, Duncan, Stewart, Still, Ponton and Gallihar retaliated against him by delaying his progress through the VDOC's Step-Down Program, which would have allowed him to be transferred out of segregation and into general population housing, because of his testimony for Blount and filing lawsuits. The second is that defendants Gilbert, Gallihar and Stewart delayed his progress through the Step-Down Program in retaliation for his exercise of his constitutional right to petition by filing informal complaints and grievances.

Snodgrass claims that the defendants retaliated against him because he filed a civil rights case against several Red Onion employees in April 2015 and because he testified in another inmate's civil rights litigation in November 2015. In particular, he claims that the defendants retaliated against him for providing declarations as evidence and testifying for inmate Donnell Blount in November 2015. He also claims that the defendants have retaliated against him for filing a lawsuit against Raiford and Adams in this court in April 2015. He said that this lawsuit was

dismissed by the court because it found that he had failed to exhaust his administrative remedies before filing.

At his 2017 bench trial, Snodgrass testified that, when he first arrived at Red Onion on March 12, 2012, he was a security level 5 inmate and was housed in general population. He said that he received a disciplinary infraction and was placed briefly in segregation housing in July 2012, but he was released back to general population when the charge was overturned. Snodgrass said he was placed in segregation again on October 12-13, 2013, for fighting. He said that, when he was released back to a general population, Red Onion was on lockdown. He said he was placed in segregation again on December 7 or 9, 2013, because defendant Swiney said he found knives in his cell. At one point in his testimony, Snodgrass said that he had not been housed in general population since December 2013.

Snodgrass testified that, between April and June 2015, when defendant Raiford would pass his cell door, she would bang on the door and comment on a lawsuit he had filed against her. At one point, Snodgrass told Raiford he was going to sue her. He said that she responded, "How did that work out for you last time?"

At another point in his testimony Snodgrass said that he was placed in segregation again at Red Onion on September 21, 2015, as a result of disciplinary charges. Snodgrass said that he was written up when he refused to submit to be restrained to exit his cell. Snodgrass said that he refused to be restrained because there was no such requirement in that housing unit. He said that defendant Gilbert sprayed OC pepper spray into his cell several times until he submitted to being restrained. Snodgrass said that, as a result, he, again, was placed in segregation.

Snodgrass said that four days later he received a 48-hour notification that he would have an interim security review. Snodgrass said that the Institutional Classification Authority, ("ICA"), hearing for this interim security review was held October 6, 2015. As a result of this review, Raiford recommended that Snodgrass's security level be changed from a level 6 to level S, segregation, due to poor behavior and poor adjustment at the lower security level 6. (Plaintiff's Exhibit No. 2, Docket Item No. 75-2.) The ICA hearing report stated that the recommendation was made because Snodgrass had attempted the Step-Down Program on three separate occasions without success and because he had received 13 institutional infractions since March 12, 2015.  The ICA hearing report stated, in part:

> [Snodgrass's] first attempt [in the step-down program] was on 10-16-14 in phase I.  He entered Phase II on 1/7/15. Offender received charges … on 3/12/15. His second attempt was on 5/11/15 in phase I. He obtained charges while in Phase I…. Offender Snodgrass made his third attempt on 7/1/15 in Phase I. He moved to Phase II on 8/11/15 and on 9/11/15 he obtained [charges]. … Due to offender['s] poor behavior in a level "6" setting[,] it is recommended he be returned to a segregation setting where he can best be benefitted from the security, supervision, and programs of segregation at this time.

(Plaintiff's Exhibit No. 2 at 1.)

Snodgrass testified that, at this ICA hearing, he told Raiford that he had not received 13 infractions since March 12, 2015. He said that he also told defendant Kegley that there had been false charges placed against him. Furthermore, he said that the hearing report showed that Raiford improperly conducted the original ICA hearing and the administrative review of her own decision. The hearing report also shows that defendant Washington of Central Classification Services, ("CCS"),

approved Snodgrass being designated a security level S prisoner on October 26, 2015.

Snodgrass said that the ICA hearing report incorrectly stated that he received two "299" charges on June 11, 2015, when he received only one such charge on that date. He said the form also incorrectly stated that he received another 299 charge on August 20, 2015. Snodgrass testified that he wrote a letter to defendant Washington on December 2, 2015, notifying him that employees at Red Onion were conspiring to continue to house him in long-term segregation. (Plaintiff's Exhibit No. 30, Docket Item No. 76-21.) Snodgrass, however, does not make any mention in this letter of this being in retaliation for exercising his First Amendment rights.

When he was returning to his cell from a visitation on October 26, 2015, Snodgrass said that defendant Swiney told him to pack his property because he was being moved to C Building. Snodgrass said that he was moved to cell C-508 in the "Intensive Management" pod. Snodgrass said that this move occurred despite the fact that neither the Warden of Red Onion nor the regional administrator had reviewed his reclassification to security level S as required by VDOC Operating Procedure, ("OP"), 830.2 on Security Level Classification. (Plaintiff's Exhibit No. 4 at 8, Docket Item No. 75-4 at 8.) OP 830.2 states:

> Each offender approved by CCS for reclassification to Security Level S will be reviewed by the Warden of … Red Onion … and the appropriate Regional Operations Chief or designee (Regional Administrator).

(Plaintiff's Exhibit No. 4 at 8.)

Snodgrass testified that one of the charges placed against him on September 21, 2015, by Gilbert, a 212 threatening bodily harm infraction, was dismissed on November 9, 2015. He said that, after this infraction was dismissed, he spoke to numerous people in an effort to be transferred out of segregation, including Gallihar, Swiney and Warden Barksdale.

Snodgrass said that he testified by videoconference from Red Onion on November 19, 2015, in a § 1983 case brought by Red Onion inmate Donnell Blount. Snodgrass testified that the next day, November 20, 2015, defendant Adams, a correctional lieutenant, banged on his cell door at around 1:30 p.m. Snodgrass testified that Adams told him, "You fucked up now. You told me you weren't going to testify." He said Adams also told him, "Your time in segregation will be hard." Snodgrass said that he told Adams that his testifying for another inmate had nothing to do with his housing status. He said Adams responded, "We'll see" and walked off. Snodgrass also said that, on the morning of November 26, 2015, Adams was making rounds when he passed Snodgrass using the pod kiosk. Snodgrass said that Adams called him a "fucking snitch." Snodgrass said he asked Adams, "What?" Adams then yelled it out so that everyone in the pod could hear him.

Snodgrass said that on November 30, 2015, defendant Duncan brought him a 48-hour notice that a security level review corrective action hearing would be conducted. (Plaintiff's Exhibit No. 6 at 1, Docket Item No. 75-6 at 1.) He said this hearing was conducted on December 2, 2015. He said that, during the hearing, Swiney looked at the paperwork and told him that he was going to recommend that Snodgrass remain designated a security level S.

Snodgrass testified that he did not receive any Challenge Series workbooks from September to December 2, 2015. An inmate is required to complete these workbooks to progress in the Step-Down Program. He said that he had spoken to Duncan, Gilbert and Warden Barksdale in an effort to receive the workbooks.  He said when he asked Duncan to receive the Challenge Series workbooks, she told him that she had no authority to provide him the workbooks even though she was his counselor. Snodgrass said that when he asked Gilbert why he was not being provided the Challenge Series workbooks, Gilbert said he did not know what was going on and "I have nothing to do with that." Snodgrass said that he asked Duncan why there had been no corrective action taken after the disciplinary charge against him was dismissed in November. He said that Duncan responded, "All I am doing is what they tell me to do."

Snodgrass said that when he received the report for the December 2, 2015, ICA hearing, he noticed that Swiney had made the initial hearing determination to designate him a security level S, and he also had reviewed and upheld the initial determination on administrative review. (Plaintiff's Exhibit No. 6 at 2, Docket Item No. 75-6 at 2.) Snodgrass testified that he filed a Regular Grievance appealing Swiney's decision upholding his S security level. (Plaintiff's Exhibit No. 7, Docket Item No. 75-7.) At the Level I review, Assistant Warden Hamilton ruled Snodgrass's grievance was "UNFOUNDED" because, contrary to the documentation provided, the CORIS computer system showed that Adams had made the initial December 2, 2015, ICA decision and that Swiney had reviewed the decision on appeal. (Plaintiff's No. 7 at 2.) Snodgrass testified that, on appeal at Level II, the decision was reversed to "FOUNDED" based on Swiney improperly issuing the initial decision and reviewing the security level designation on appeal. (Plaintiff's Exhibit No. 7 at 3.) The Regional Administrator ordered that Snodgrass be granted a rehearing.

Snodgrass testified that this rehearing occurred March 17, 2016. He said that, on rehearing, the decision was the same – to designate him a security level S. (Plaintiff's Exhibit No. 8, Docket Item No. 75-8 at 2.)

Snodgrass said that, by the time of this hearing, he had received and completed the first two workbooks in the Challenge Series. He said that he did not receive any institutional charges from September 15, 2015, to March 17, 2016. Despite being charge free for approximately six months, Snodgrass said that an ICA housing review was conducted on January 29, 2016, and Gilbert recommended that he be designated as Special Management 0 or SM-0. (Plaintiff's Exhibit No. 9 at 1, Docket Item No. 75-9 at 1.) This decision was upheld on review by Swiney. Snodgrass admitted into evidence a Regular Grievance dated February 28, 2016, challenging this review decision, but it does not show that the Grievance was ever received or accepted by the prison's Grievance Department. (Plaintiff's Exhibit No. 9 at 3, Docket Item No. 75-9 at 3.)

Snodgrass said that, after finishing the first two workbooks of the Challenge Series, he was elevated to SM-1 status and moved to cell C-640 on March 2, 2016. After being moved to SM-1 status, Snodgrass said that he went 120 days without any advancement in his status. Beginning with the third workbook of the Challenge Series, Snodgrass said, an inmate had to attend classes to complete the workbooks. He said that from the time he was moved to cell C-640 until late July or early August, he was allowed to participate in only one or two classes, and no one would tell him why. He said that other offenders came into the C-6 pod after him and were allowed to progress through the classes ahead of him. Snodgrass said that he had two additional 90-day ICA reviews between March 2 and early August 2016.  At both reviews, he was told that his status could not be elevated because he had not

completed through workbook 5 of the Challenge Series. Snodgrass said that he filed a Regular Grievance over being denied the classes necessary to complete workbook 5. (Plaintiff's Exhibit No. 10 at 2, Docket Item No. 75-10 at 2.) He said that he was allowed to start attending classes to work on his Challenge Series workbooks again in late July or early August 2016.

Snodgrass testified that he was denied elevation to SM-2 status even after he completed through workbook 5 of the Challenge Series. He said that, after he was denied SM-2 status for the third time, he filed an Offender Request form asking why. He said that Duncan provided a written response to his inquiry, dated August 4, 2016, which stated: "You continue to have poor status ratings in Respect." (Plaintiff's Exhibit No. 11, Docket Item No. 75-11.) Snodgrass said that he had an ICA 90-day review hearing on August 3, 2016, and Gilbert recommended that Snodgrass remain in segregation on SM-1 status.[3] The rationale given for the recommendation was: "Offender has not met all the requirements of the step down program." (Plaintiff's Exhibit No. 12 at 2, Docket Item No. 75-12 at 2.)

Snodgrass submitted into evidence VDOC OP 830.A regarding the Segregation Reduction Step-Down Program. (Plaintiff's Exhibit at No. 5, Docket Item No. 75-5.) Operating Procedure 830.A, Appendix G at page 59, lists the requirements an inmate must achieve to progress to the next level of the Step-Down Program, including the Responsible Behavior Goals – cell compliance, personal hygiene, standing for count and respect. (Plaintiff's Exhibit at No. 5 at 23, Docket Item No. 75-5 at 23.) Snodgrass testified that, even though he was being told that he

---

[3] The ICA Hearing Report, (Plaintiff's Exhibit No. 12 at 2, Docket Item No. 75-12 at 2), states that Gilbert recommended a "status change" to SM-1, but Snodgrass already was designated SM-1.

was not progressing because he was not meeting these goals, he was only told on two occasions where he was lacking. One of these occasions, Snodgrass said, was Duncan's written response to his inquiry dated August 4, 2016. The other occurred when Gallihar told him once that he "didn't meet the level for respect."

Snodgrass testified that he was elevated to SM-2 in late August or September 2016, and he began attending classes and completed workbooks 6 and 7 of the Challenge Series. Snodgrass said that he was demoted to SM-1 in December 2016 after he was convicted of a disciplinary charge of falsifying information on a grievance form. As a result, Snodgrass said that he was placed in another class in January 2017, and he had to complete workbooks 3, 4 and 5 again. He said he completed these books again by March 2017. Snodgrass said that he was elevated to SM-2 again and completed workbooks 6 and 7 again by May 2017.  He said on June 18, 2017, he was given a 48-hour notification that he was going to be released to a structured living unit. He said that he packed his cell up the next day and was moved to a structured living unit in Building D-5. He said that was where he was housed at the time of his 2017 trial.

Once Snodgrass arrived at the structured living unit, he said that Swiney told him they were going to catch him up with the rest of the group, who were already on Lesson 7 or 8. Snodgrass said that he did two private lessons a day with a counselor until he was at the same lesson as the rest of his group. Snodgrass said that he was supposed to graduate from the program and be eligible to be placed in Level 5 general population on the second day of his 2017 trial.

Snodgrass testified that, while he was housed in the C-1 Unit from January to March 2016, Swiney, Adams, Gilbert and Gallihar, all, made repeated references to

Snodgrass's "filing paperwork." He stated that on one occasion, while he was being held in cell C-123, he had attempted to file a lawsuit in state court, but his documents never arrived at the court. He said that Gilbert asked about him filing the lawsuit and said, "If you are going to keep doing things like this, you are never going to make it out of segregation."

Red Onion inmate Robert Lee Brown, Jr., also testified at the 2017 trial. Brown testified that he was housed in cell C-518 directly above Snodgrass in cell C-508 in November 2015. Brown said that he was in the unit with Snodgrass from November 2, 2015, to January 1, 2016, and he said that he repeatedly heard Snodgrass ask anyone he could about getting the Challenge Series workbooks. He said that he even told counselor Kegley that Snodgrass needed to speak to her about getting the workbooks. He said that Kegley told him "that offender's problem is not your problem." He said that he did not recall telling anyone else that Snodgrass was requesting workbooks.

Brown testified that there were seven workbooks in the Challenge Series that an inmate had to complete before he could be moved from segregation to general population. He said that completion of the workbooks was not optional and had to be completed to be placed in general population. He said all the counselors at Red Onion tell the inmates that completion of the Challenge Series workbooks is required to move from segregation to general population.

Brown testified that in segregation housing there were different security levels. He said that intensive management or "IM" inmates had to be shackled any time they were removed from their cells. He said that special management or "SM" inmates were maintained in a setting that was a segregation population setting.

Red Onion inmate Stephen Lamarck Roberts testified that he was housed in cell C-124 while Snodgrass was housed in cell C-123. Roberts testified that he had heard Snodgrass request to be given the Challenge Series workbooks. Roberts also testified that he had heard Gallihar tell Snodgrass on one occasion that he was not progressing through the Step-Down Program because he was not being respectful. He said that he heard Snodgrass ask, "What do you mean by respect?" He said that Gallihar told Snodgrass that he had not reached the necessary level of respect on his weekly assessment yet. He said that he also had heard Snodgrass ask Gallihar why he was refusing to elevate his security level, and Gallihar had responded that Snodgrass had to complete the workbooks. He said he heard Snodgrass then ask why he was being denied the workbooks, and Gallihar responded that Snodgrass was being denied the workbooks because he had not reached the appropriate level in the program to receive the workbooks requested. Roberts testified that he heard Gallihar on other occasions tell Snodgrass that he had not reached the proper level of respect because he kept complaining and "writing stuff up."

Red Onion inmate Donnell Hickman testified that in January 2016 he was housed in the intake pod, Unit B-3 at Red Onion, when he spoke with the treatment officers and requested and received the first two Challenge Series workbooks. He said that he received the workbooks within two weeks of his request. Hickman testified that on one occasion, while he was housed in cell C-635, and Snodgrass was housed in cell C-640, he heard Gilbert tell Snodgrass "stop filing paperwork and you can get out of seg [regation]." Hickman claimed that he had a clear view from his cell to the outside of Snodgrass's cell, but he offered no explanation of how he could hear a conversation taking place several cells away.

Red Onion inmate Willie DaQuan Lee testified that he was transferred to Red Onion and placed in segregation after being charged with assault with a weapon on another VDOC inmate. Lee stated that he received the first two Challenge Series workbooks within two weeks of his arrival at Red Onion.

Red Onion inmate Gary Lamont Wall said that, when he was placed in segregation, it took him more than two months to receive the first two Challenge Series workbooks. Wall said that while OP 830.A states that participation in the Step-Down Program is not mandatory, Red Onion inmates are not released from segregation housing unless they complete the program. Wall stated that he overheard Raiford speaking to Snodgrass in March or April of 2017. He said he heard Raiford tell Snodgrass that she was tired of his family calling the prison and complaining about his terms of confinement.

Snodgrass's mother, Kimberly Snodgrass, also testified. Kimberly Snodgrass said that in November 2015, while she was visiting with Snodgrass at Red Onion, Warden Barksdale came into the visitation room. She said that she asked Barksdale why her son was being held in segregation. In particular, she said that she asked Barksdale what her son had to do to get out of segregation housing. She said that Barksdale replied, "Not testifying for others." She said she really did not know what Barksdale meant by the statement, so, when Snodgrass was brought into the visitation room, she asked him, "Who are you testifying for?" Kimberly Snodgrass stated that she received an Offender Timeline from Snodgrass, showing that he would not be released to general population until 2020 even if he completed the Challenge Series and all requirements of the Step-Down Program by 2018. (Plaintiff's Exhibit No. 1, Docket Item No. 75-1.)

Arvil James Gallihar testified that he was the Chief of Housing and Programs at Red Onion at the time of the 2017 trial and had been in that position from October 2015 to February 2016. Gallihar testified that OP 830.2 was the VDOC policy that governed inmate security classifications, including annual reviews. (Plaintiff's Exhibit No. 4, Docket Item No. 75-4.) Gallihar testified that VDOC inmates are classified based on security level and based on housing assignment. He said that an inmate's security level is classified based on points from a low of level 1 to a high of level "S." He said inmates also are classified for housing as either general population or segregation. According to Gallihar, a VDOC inmate with any security level between 1 and 6 can be housed in general population. Offenders with a security level of S are always housed in segregation, and all but a very few VDOC level S offenders are housed at Red Onion, he said. The others are housed at Wallens Ridge State Prison, ("Wallens Ridge").

Gallihar testified that OP 830.2 requires each offender to have a security level review at least annually. Gallihar stated that a certain score was not required to be placed in segregation housing, but rather an inmate would be designated at an S level based on certain "qualifiers" listed in OP 830.2. Among the qualifiers listed in 830.2 that could result in a level S security placement are assault on staff or inmates, escape risk, damaging state property, gang activity and staff manipulator/predator. (Plaintiff's Exhibit No. 4 at 8, Docket Item No. 75-4 at 8.) Gallihar said that all offenders designated at a level S security level have a security level review every 90 days.

Gallihar testified that he had requested to speak with Snodgrass in the past two months and that he had requested that Snodgrass be placed in restraints for the conversation. He said that any staff member had the right to have any inmate

restrained when he was going to meet with the inmate in an office. He said that he had Snodgrass cuffed due to safety concerns based on Snodgrass's history of being very disrespectful to staff on occasion. Gallihar said that he discussed Snodgrass's participation in the Thinking for a Change program at this meeting.  He said that Snodgrass was classified at a security level 6 at the time of the meeting. Gallihar said that his intention was to encourage Snodgrass to complete the program because he had recently not completed his homework, had arrived late for class and would not participate in role-playing assignments.

Gallihar stated that Snodgrass had been classified at security level 6 on four separate occasions while being housed at Red Onion. Gallihar also stated that he had reviewed Snodgrass's compliance with the Step-Down Program behavioral goals with Snodgrass on numerous occasions. He said that he specifically recalled at least one or two times when Snodgrass did not progress in the program based on status reviews that showed he was disrespectful to staff. Gallihar conceded that whether a person was being respectful was very subjective and that there were no specific criteria listed in the policy by which to judge whether an inmate was being respectful or not.

Gallihar said that multiple people scored an inmate's compliance with the Step-Down Program's behavioral goals on a chart each week. These staff members included unit managers, officers and counselors. He said that monthly reviews were conducted of each inmate's compliance and that someone should review the staff's findings with the offender each month. Gallihar said that he never intentionally delayed any inmate's progression through the Step-Down Program other than as required by the policy guidelines. He said that he had never conspired with anyone

to delay Snodgrass's progress through the Step-Down Program because of any lawsuit he had filed.

Gallihar said that the Step-Down Program was designed to give inmates a way to work their way out of segregation housing. He said that when an inmate was designated to segregation, he was placed in an orientation pod and was given the first two workbooks in the Challenge Series within the first few weeks. He said there would be no reason to withhold these workbooks from any inmate.

Gallihar testified that VDOC OP 830.1 governed Facility Classification Management, including ICA reviews. (Plaintiff's Exhibit No. 3, Docket Item No. 75-3.) He also testified that VDOC OP 861.3 governed Special Housing. He said that OP 861.3 required an offender's assignment to segregation to be reviewed at least every 90 days. (Plaintiff's Exhibit No. 22 at 12, Docket Item No. 76-13 at 12.)

Gallihar said that Snodgrass was returned to security level S from a level 6 in 2015 based on possession of an intoxicant, threatening bodily harm and refusing to come out of his cell. Gallihar stated that Snodgrass was housed in C Building at Red Onion from November 2015 to March 2016. Gallihar stated that once Snodgrass was returned to segregation, he had no personal knowledge whether anyone provided him with the Challenge Series workbooks he was required to complete. He stated that he did not give these workbooks to Snodgrass. Gallihar admitted that he had input in deciding to keep Snodgrass designated at a security level S from November 2015 to February 2016. He said that he did not recommend Snodgrass's earlier release from segregation because he did not believe he was ready for release.

Gallihar was asked why Snodgrass's ICA hearing report stated that staff was recommending that Snodgrass be reclassified from a security level 6 to a security level S based on his score of 61 points, if no specific points level was required for the S security level. Gallihar responded that the inmate's building management team would consult with each other to determine a recommendation, but that the Warden or his designee makes the final decision regarding a security level increase.

Amee Duncan testified that she had worked as a unit manager at Red Onion since February 25, 2016. She said that she worked as a counselor at Red Onion for 10 years prior. She said that she was Snodgrass's counselor from late 2014 to February 25, 2016. Duncan stated that VDOC OP 830.A governed operation of the step-down unit at Red Onion. Duncan testified that, if an inmate came to Red Onion as an S level inmate, he would be placed in the orientation pod and then transferred to C Building. If an offender had been classified as an S level offender in the past, she said, the inmate might skip orientation and be placed directly in segregation in the C Building.

Duncan testified that SM, or special management, inmates spent at least 90 days at each level of the Step-Down Program. She said IM, or intensive management, inmates spent 180 days at each level of the program. During this time, an inmate must complete the program, or the required workbooks from the Challenge Series, and the inmate must remain infraction free. She said that there also was a "personal responsibility" component of the program, which required the inmate to meet certain standards of hygiene, respect and cell compliance. These personal responsibility components were designed, she said, to improve and develop "pro-social" behavior in the inmates and ensure orderly operation of the institution. She stated that an inmate's progress in these areas was rated by his counselor, floor

officers and correctional officers each week. She said that an inmate's counselor also would get feedback from the inmate's treatment officer and others who had interactions with the inmate.

Duncan testified that inmates should be routinely, verbally updated on their performance on these personal responsibility standards. She said that, if an inmate did not progress in the program because he did not meet the standards expected of him, the inmate's counselor or the building lieutenant would discuss the areas that needed improvement with the inmate. Duncan said that she and the building lieutenant made daily rounds through the step-down unit and spoke with the inmates on their progress. Duncan specifically testified that Snodgrass was informed of the results of his weekly review verbally every week by his counselor, Gilbert or herself. She said that she personally spoke with Snodgrass regarding his progress and his need for improvement in the area of respect to progress through the program. Duncan said this was due, at least in part, to Snodgrass's obsessive use of profanity, which was viewed by staff as disrespectful.

Duncan testified that Snodgrass was placed at level S status in December 2013. She said that Snodgrass progressed to level 6 before he received an infraction in October 2014 and was demoted back to SM-1. She said that Snodgrass moved back and forth between SM-1 and SM-2 status until September 2015 when he was placed back at SM-0 status. Duncan testified that Defendants' Exhibit No. 2 contained Snodgrass's annual ICA security level review for 2014-15. (Docket Item No. 76-2 at 1.) This exhibit also contains Snodgrass's annual good time level review, which was approved on review by Assistant Warden Hamilton. (Docket Item No. 76-2 at 1.) This exhibit also contains an October 1, 2015, ICA Referral Notice for an interim security level review based on Snodgrass's return to SM-1 status. This notice

shows that Counselor Kegley served it on Snodgrass. (Docket Item No. 76-2 at 2, 9.)

Duncan testified that Plaintiff's Exhibit No. 2, the ICA hearing report from Snodgrass's October 6, 2015, ICA hearing, showed his return to segregation, or SM-0, status. Duncan admitted that an infraction used to demote Snodgrass's status, a charge of threatening bodily harm on September 21, 2015, was later overturned on appeal. She said that a Corrective Action hearing was held due to this change on December 2, 2015, which resulted in no change in Snodgrass's security level. (Plaintiff's Exhibit No. 6, Docket Item No. 75-6.)

On cross-examination, Snodgrass asked Duncan why the score used to assess his security level increased from 61 to 69 points if the Corrective Action was taken as the result of an infraction being overturned. Duncan stated that she was not sure why that occurred, but she testified that another Corrective Action hearing was held for Snodgrass on March 17, 2016. (Plaintiff's Exhibit No. 8, Docket Item No. 75-8.) It was determined that Snodgrass should remain at the S security level at that time, she said.

Duncan testified that Defendants' Exhibit No. 1 was a list of infractions of which Duncan had been convicted. (Docket Item No. 76-1.) Duncan said that the report was generated from the VDOC CORIS computer database. The report states that it was run on August 10, 2017, and contains infractions issued against Snodgrass from March 27, 2008, to August 10, 2017. She said that none of the infractions listed were later overturned. Among other infractions, this report shows that Snodgrass was convicted of possession of intoxicants and disobeying an order on September 21, 2015, threatening bodily harm on September 22, 2015, possession of contraband

on May 4, 2016, and lying or giving false information to an employee on November 22, 2016.

Duncan stated that after being placed on SM-0 status, Snodgrass progressed to SM-1 status approximately 90 days later in February 2016. Duncan said that Snodgrass did not progress to SM-2 status until he completed Book 5 of the Challenge Series in September 2016. After Snodgrass was placed on SM-2 status, she said, he received an infraction for lying and was returned to SM-1 status. She said that Snodgrass again progressed to SM-2 status in March 2017. Since that time, Duncan said, Snodgrass has progressed to Level 6, Phase I, and he was scheduled to graduate from the Step-Down Program.

Duncan denied that she had any knowledge that Snodgrass had ever been denied any of the Challenge Series workbooks. Duncan testified that she did not retaliate in any way against Snodgrass for filing lawsuits and that she did not even know that he had testified in anyone else's lawsuit. She specifically denied that she had delayed his progression through the Step-Down Program based on his involvement in litigation. In particular, Duncan denied that she had any knowledge that he was denied an opportunity to attend class to complete the program from April to September 2016. In fact, Duncan testified that she had personally spoken with Snodgrass during this period of time and that he had not told her that he was not being allowed to attend the classes.

Duncan testified that, during discovery, she had provided Answers to Interrogatories to Snodgrass. (Plaintiff's Exhibit No. 14, Docket Item No. 76-5.) She admitted that she signed these answers under oath on June 12, 2017.  In these answers, Duncan admitted that she responded to an interrogatory which asked when

Snodgrass would be allowed to progress from segregation to general population as follows:

> Plaintiff must complete all requirements outlined for the SM pathway. He is currently assigned to SM-2. Based upon his current status and continued progress, he will be eligible for review by the Dual Treatment Team for SM completion July 6, 2017.

(Plaintiff's Exhibit No. 14 at 4.) Duncan testified that July 6, 2017, was Snodgrass's projected completion date when she signed her discovery responses. Duncan stated that she did not know who authorized Snodgrass being placed at a security level 6 on June 9, 2017. She said, "I knew you were gone as of June 9, 2017."

Duncan testified that the Offender Timeline, admitted as Plaintiff's Exhibit No. 1, was a timeline developed by an inmate's counselor with the inmate. (Docket Item No. 75-1.) She stated that she had no idea why Snodgrass's counselor at the time, K. Gibson, had placed Snodgrass's return to general population at 2020 or later. Duncan stated that the document had been signed by Snodgrass.

Duncan admitted that she conducted an administrative review of an ICA hearing disposition issued on May 9, 2017, recommending that Snodgrass remain in segregation at SM-2 status. (Plaintiff's Exhibit No. 24 at 4, Docket Item No. 76-15 at 4.) Duncan said that she did not know why Snodgrass's appeal of the decision was founded. The exhibit states that Snodgrass's appeal was founded because the 90-day review was not conducted within the 90-day time frame as required by OP 861.3 on Special Housing.

Tori Raiford testified at trial that she had no direct contact with Snodgrass after she became DOC Restrictive Housing Coordinator in October 2015. Raiford

said that, prior to October 2015, she was a unit manager at Red Onion. Raiford admitted that she did make the initial decision on Snodgrass's October 6, 2015, security level review. (Plaintiff's Exhibit No. 2, Docket Item No. 75-2.) Although the form states that she also conducted the Administrative Review of her own decision, Raiford testified that Warden Barksdale actually conducted the Administrative Review on October 9, 2015.  She said that, if Barksdale had sworn that he did not approve this decision on Administrative Review, that was inaccurate.

Raiford testified that Defendants' Exhibit No. 3 was a printout of a screenshot of information contained in the VDOC CORIS system that showed that she conducted the initial review and Barksdale conducted the Administrative Review of Snodgrass's security level change to segregation. (Docket Item No. 76-3.) This document, however, also contradicts the ICA hearing report, in that it states that Raiford made the initial decision on October 9, 2015, instead of October 8, 2015. Raiford testified that, while working at Red Onion as a unit manager, she did not possess the final authority regarding inmate security level changes.

Raiford testified that she has never threatened Snodgrass in any way. She said that, in 2015, she was not aware she had been sued by Snodgrass and that she had not tried to discourage him from filing lawsuits. She said that she had not conspired with anyone to retaliate against Snodgrass based on his filing of lawsuits.

E. R. Barksdale testified that he had been the Warden of Red Onion from January 2015 to December 2016. He said that, on the date of trial, he was working as the Warden at Baskerville Correctional Center. Barksdale admitted that, just as he had stated in his discovery responses, (Plaintiff's Exhibit No. 13 at 2, Docket Item No. 76-4 at 2), he had no recollection of approving on Administrative Review

Raiford's decision to change Snodgrass's security level to S on October 8, 2015. He further stated that he could not testify whether Plaintiff's Exhibit No. 2 was correct in stating that Raiford made both the initial decision and conducted the Administrative Review or whether Defendants' Exhibit No. 3 was correct in stating that he conducted the Administrative Review. He did agree, however, that it would have been improper for Raiford to make the initial decision and review her own decision on appeal.

Barksdale testified that he never told Snodgrass's mother, Kimberly Snodgrass, that Snodgrass should not testify for other inmates if he wanted released from segregation. Barksdale conceded, however, that in his sworn answers to interrogatories, he stated that he had no recollection of having any conversation with Snodgrass's family. (Plaintiff's Exhibit No. 13 at 2, Docket Item No. 76-4 at 2). He testified that, at the time that he signed his discovery responses, he did not recall his conversation with Snodgrass's family. He said that, when he heard Kimberly Snodgrass testify the day before, it had caused him to recall the conversation with her. Barksdale testified that he then remembered telling her that Snodgrass should stop fighting other people's battles. At another point, Barksdale admitted that he told Kimberly Snodgrass that Snodgrass should focus on what he was doing and not get tied up in other inmates' issues.

Garry A. Adams testified that he had been a correctional lieutenant at Red Onion for three years, including in September 2015. Adams denied that he had ever threatened Snodgrass. He said that he did not tell Snodgrass that his time in segregation would be extended because he had testified for another inmate. He said he never called Snodgrass a "snitch," and he never told Snodgrass that the defendants were purposefully delaying his progression through the Step-Down Program

because he had testified for another inmate. He testified that he had not conspired with anyone to delay Snodgrass's progress in the program.

While Adams admitted that he conducted ICA reviews to determine whether Red Onion inmates should be released from segregation, he stated that he did not know the criteria on which these reviews were based. Adams said that he followed the recommendation of the counselors. Adams conceded that, under OP 830.1, which governed Facility Classification Management, counselors did not have the authority to make recommendations to the ICA regarding the inmate's security classification. Adams admitted that, under OP 830.1, it was the hearing officer's or ICA's responsibility to make the determination as to the proper security level classification for an inmate. In particular, OP 830.1 states that the ICA hearing officer is supposed to make a recommendation "based only on the facts presented at the hearing and review of the offender's record." (Plaintiff's Exhibit No. 3 at 4, Docket Item No. 75-3 at 4). Furthermore, OP 830.1 lists the responsibilities of an inmate's counselor with regard to ICA reviews, and making a recommendation as to an inmate's security level is not one of the counselor's responsibilities. (Plaintiff's Exhibit No. 3 at 4).

Adams testified that he was not aware that Snodgrass was ever denied access to the Challenge Series workbooks. He stated that the treatment officers are supposed to issue the workbooks to an inmate based on the inmate's security level. Adams admitted that, to his knowledge, the Step-Down Program was not mandatory, in that it was not required by VDOC policy to be released from segregation.

Christopher Gilbert testified that he worked as the operations supervisor at Red Onion. He said that he had been a correctional lieutenant since February 2012.

He said he was the building lieutenant for Red Onion C Building from December 2015 to December 2016. Gilbert testified that he had never threatened Snodgrass over his lawsuit. He also denied ever saying anything to Snodgrass about testifying for any other inmate. In fact, Gilbert said that he did not recall that Snodgrass testified for inmate Blount. He said that he had never retaliated against Snodgrass for filing this or any other lawsuit. He said that he had not conspired with anyone to delay Snodgrass's progression through the Step-Down Program.

Gilbert said that he did not recall whether he wrote an infraction against Snodgrass for providing false information on November 22, 2016, but he conceded that he may have. Gilbert said that he understood that Snodgrass was charged with this infraction because Snodgrass had made a complaint under the Prison Rape Elimination Act, ("PREA"), against an officer, claiming an incident had occurred on a date that the officer was not at work. Gilbert conceded that OP 861.1 states that inmates should not be charged with lying or providing false information based on "reports of sexual abuse and offender grievances made in good faith, based upon a reasonable belief that the alleged conduct occurred." (Plaintiff's Exhibit No. 26 at 8, Docket Item No. 76-17 at 8.) Gilbert stated that, whether he wrote the charge against Snodgrass or not, he believed the charge was appropriate because he did not believe the complaint had been made by Snodgrass in good faith.

Gilbert testified that he was the building lieutenant in charge of the D-5 Building at Red Onion on September 21, 2015, when correctional officers discovered "mash," a homemade alcoholic beverage, in Snodgrass's cell, cell D-502. Gilbert stated that Snodgrass was at security level 6 on this date. Gilbert admitted that OC pepper spray was used on Snodgrass that day when he refused orders to be restrained to be brought out of his cell. Gilbert testified that he participated in the

preparation of an incident report regarding the use of force on Snodgrass that day. (Plaintiff's Exhibit No. 27, Docket Item No. 76-18.) The incident report reflects that Snodgrass was charged with two infractions: possession of intoxicants and threatening bodily harm.

Gilbert testified that a Case Plan Agreement generated by Snodgrass's counselor, Gibson, on May 24, 2016, showed that Snodgrass was participating in the Step-Down Program and was in the process of completing the Challenge Series workbooks. (Plaintiff's Exhibit No. 29, Docket Item No. 76-20.) The Agreement contains what purports to be the signature of Snodgrass. Gilbert testified that these agreements were generated and given to an inmate as part of their annual review. Gilbert testified that the Offender Timeline, admitted as Plaintiff's Exhibit No. 1, was a document that appeared also to have been generated by Snodgrass's counselor, Gibson. Gilbert said that he was not familiar with this particular document, but he agreed that it stated that Snodgrass would not be integrated into the prison's general population until after the year 2020. Gilbert agreed that it should not take an inmate that long to complete the Step-Down Program to be released from segregation. Gilbert stated that he or another staff member spoke with each inmate in the Step-Down Program once a month to explain his progress or why he had not met the personal behavior goals.

Snodgrass submitted discovery responses from a number of defendants into evidence, (Plaintiff's Exhibit Nos. 13-21, Docket Item Nos. 76-4 to -12). In his discovery responses, Barksdale stated that unit managers at Red Onion do not have authority to issue final approvals for security level increases unless they are acting as the Warden's designee. (Plaintiff's Exhibit No. 13 at 2.) He also stated that, as a unit manager, Raiford would have had final authority to approve an inmate's security

level only if it was unchanged. (Plaintiff's Exhibit No. 13 at 2.) Barksdale said that he had no recollection of approving Raiford's recommendation to house Snodgrass as a level S offender on October 9, 2015. (Plaintiff's Exhibit No. 13 at 2.)

In Duncan's discovery responses, she stated that she became unit manager for the C Building at Red Onion on February 25, 2016. (Plaintiff's Exhibit No. 14 at 1.) Duncan stated that Snodgrass has participated in the Challenge Series "in accordance with established policy." (Plaintiff's Exhibit No. 14 at 2.) She said that offenders assigned to SM-0 status must complete a minimum of 90 days at that privilege level, complete workbooks 1 and 2 of the Challenge Series, meet their weekly status review requirements and be approved by the building review team for advancement. (Plaintiff's Exhibit No. 14 at 2.) She said that Snodgrass was assigned SM-0 status on November 2, 2015, advanced to SM-1 status on February 26, 2016, and advanced to SM-2 status on September 1, 2016. (Plaintiff's Exhibit No. 14 at 2-3.) She said that Snodgrass was demoted to SM-1 status again on December 8, 2016, and advanced to SM-2 status again on April 6, 2017. (Plaintiff's Exhibit No. 14 at 3.)

In Gallihar's discovery responses, he stated that, for an offender to be released back into general population, the offender must progress from SM-0 to SM-1 to SM-2 to security level 6. (Plaintiff's Exhibit No. 15 at 1.) Once an offender reached security level 6, Gallihar stated, the offender would be placed in Step Down Phase I status and must progress to Step Down Phase II and successfully complete the requirements of Step Down Phase II to be released to general population. (Plaintiff's Exhibit No. 15 at 1-2.)

In her discovery responses, Kegley stated, as a counselor, her responsibilities regarding ICA hearings are "to ensure that the offender: (1) understands the reasons

for, purpose of, and possible results of the hearing; (2) is eligible for the type of review scheduled; and (3) understands the procedure of the ICA hearing." (Plaintiff's Exhibit No. 16 at 2.) Kegley said she also is "available to present the ICA additional, relevant facts, alternative solutions or courses of action." (Plaintiff's Exhibit No. 16 at 2.)

In her discovery responses, Raiford said that disciplinary infractions, willingness to participate in the Step-Down Program and progress, safety of the institution and overall stable adjustment to current housing were all considered in determining whether an offender's housing status should be in segregation. (Plaintiff's Exhibit No. 17 at 2.) Raiford also admitted, that as a unit manager, she was not authorized to make the final decision to house an inmate at a security level S. (Plaintiff's Exhibit No. 17 at 2.)

In his discovery responses, Hamilton stated that he served as Assistant Warden at Red Onion State Prison from March 25, 2015, to April 10, 2016. (Plaintiff's Exhibit No. 20 at 1.) Hamilton also stated that, as a unit manager, Raiford never had the authority to make the final decision with regard to a security level decrease or increase. (Plaintiff's Exhibit No. 20 at 2.)

In his discovery responses, Washington also stated that a prison unit manager did not have the authority to make the final determination to increase an offender's security level to a level S. (Plaintiff's Exhibit No. 21 at 2.) Washington also denied that Raiford had ever made a final decision as to assigning an offender to a security level S, because he stated he was responsible for the final decision. (Plaintiff's Exhibit No. 21 at 3.)

At the July 2018 bench trial, Snodgrass testified that he was, then, incarcerated in general population at Wallens Ridge State Prison and had been there since May 11, 2018. Snodgrass testified that, contrary to the testimony offered by several of the defendants previously, staff at Red Onion did not conduct weekly reviews of Status Rating charts with the inmates in the Step-Down Program. Snodgrass testified that he repeatedly asked why he was not receiving the Challenge Series workbooks that he needed to complete. In response, he said, Gilbert and Gallihar repeatedly told him that he was not advancing because he was not showing the appropriate level of respect.

Snodgrass testified that an inmate was supposed to receive the appropriate Challenge Series workbooks within two weeks of arriving in segregation. He said that he never received books until sometime in February 2016. He testified that, when he would ask defendant Stewart for Challenge Series workbooks, she would say she did not "give a shit" and that it was not her responsibility. Snodgrass also testified that an unnamed correctional officer said that he had been told not to give Snodgrass any Challenge Series workbooks.

Snodgrass also testified that, from April to July 2016, he was never pulled to attend the classes necessary to complete the Challenge Series workbooks. He said that the missed classes had nothing to do with his behavior, but, rather, the treatment officer, Walker, just did not pull him or the other inmates in his group from their cells to conduct any classes. According to Snodgrass, Walker told him that "we were told not to pull group," but Walker never said who had said that. Snodgrass said that he informed Duncan that he was not being pulled for classes. Snodgrass said that the group in which he was placed did not have another inmate who wanted to move out of segregation to general population. He also said that other inmates

were placed in groups for classes that started after he started the program, but these other inmates finished before he did. Snodgrass testified, "they never had any intention of advancing me."

Snodgrass testified that he had never received a disciplinary charge that was a "seg[regation] qualifier." Because of this, Snodgrass said that he wrote a number of informal complaints and grievances about being held in segregation housing. Snodgrass did not identify any specific complaints and grievances or the specific dates on which he filed any complaints or grievances. He said that, every time he filed an informal complaint or grievance, he received a "backlash" for doing so. He stated that defendant Gilbert once told him that segregation was going to be harder for him if he "kept writing up paperwork."

At his 2017 trial, Snodgrass submitted a number of administrative remedies forms into evidence, most of which have been outlined above. These documents also included a Regular Grievance filed May 17, 2017, contesting his continuation at SM-2 status, (Plaintiff's Exhibit 24 at 1-3; Docket Item No. 76-15 at 1-3).  From an examination of these exhibits, some contain no evidence that they were actually filed with the prison's Grievance Department. Also, none of these documents named Stewart, Gilbert or Gallihar, and none of these defendants responded to these filings. In fact, Snodgrass has not presented any evidence that any of these three defendants had any knowledge of these specific complaints and grievances. While these administrative remedy forms name defendants Swiney and Duncan, they do not contain any evidence that these defendants had any knowledge of these complaints and grievances.

Snodgrass testified that when he had an ICA hearing he always would ask what facts were being considered regarding his status.  Snodgrass said that no one at an ICA hearing ever told him that any other fact was being considered other than his failure to complete the required Challenge Series workbooks.  Snodgrass said that Stewart had appeared at ICA hearings while he was in the Step-Down Program and recommended that he not advance because he had not finished the Challenge Series workbooks.

Red Onion inmate Christopher Brian Piggott also testified at the July 2018 trial. Piggot stated that he was held in segregation at Red Onion from May 20, 2016, to January 22, 2018.  For a period of that time, Piggott stated, he was housed in a cell next to Snodgrass's cell. Piggott stated that, when he participated in the Step-Down Program, supervisors did not come to him and talk about his Status Rating charts.

Red Onion inmate Derrick Lynn Bratcher testified that he and Snodgrass were in the same Step-Down Program class.  He stated that members of their group completed the Step-Down Program but were not released from segregation. Bratcher stated that he participated in a group with Snodgrass around June or July of 2017. He said that Officers Walker and Quillen were the treatment officers who taught their classes. Bratcher stated that, for about two months, this group did not receive any classes from these officers. Bratcher said that, when he asked why his group was not attending classes, he was told the officers were busy with other duties. Contrary to what he was told, Bratcher said that he observed other groups attending classes with these officers during this same period. He said that groups which started after his group completed the classes and were allowed to leave segregation before his group.

Bratcher testified that, while he and Snodgrass were housed near each other, he observed that the officers "openly displayed hostility toward Snodgrass." Bratcher stated that this was based on his observations from their interactions with the officers while pulling them from their cells for classes. Bratcher stated that he never saw Snodgrass display any hostility toward the treatment officers in class. He also said that he had never seen Snodgrass be hostile toward Gilbert. Bratcher stated that Snodgrass pretty much stayed to himself and was quiet in class.

Bratcher testified that he had gone through the Challenge Series and the Step-Down Program "quite a few times." He stated that he was in segregation at Red Onion from September of 2009 to January of 2018 when he advanced to general population.  Bratcher said that every time he would advance in the program, he would receive a disciplinary charge and be demoted. Bratcher testified that he voluntarily returned to segregation on one occasion after Lt. Fannin and Raiford told him that he would not be in the Step-Down Program long if he kept "writing stuff up."  He said he thought he was safer in segregation.

Bratcher conceded that supervisors or counselors would talk with inmates on occasion about their Status Rating charts, but he said this did not occur on a weekly basis.  He said that he was not aware of any weekly assessments or weekly reviews occurring.  Bratcher testified that he was aware that the Step-Down Program required that the inmates meet certain behavioral goals, but he did not know how the inmates were assessed on these goals. Bratcher said that the only regular reviews that he received in the Step-Down Program were his ICA hearings, which occurred every 90 days.

Defendant Gallihar also testified at the July 2018 trial.  Gallihar said that he had worked as the Chief of Housing and Programs at Red Onion for approximately three years. Before that, he said that he worked as the Chief of Security.  Gallihar stated that Gilbert was a correctional lieutenant at Red Onion and that defendant Stewart had worked at Red Onion as a correctional sergeant but was no longer employed by the VDOC.  Gallihar testified that, as Chief of Housing, he could initiate a transfer of an inmate to another facility but the decision must be approved by the Warden and Central Classification.

Gallihar testified that, due to the number of grievances filed at Red Onion, that he was not aware of any particular grievance unless he was required to respond to it.  Gallihar stated that he could not recall any informal complaints filed by Snodgrass in 2015.  He denied that he ever told Snodgrass that filing complaints would delay his progression through the Step-Down Program. He also denied that he had ever instructed Red Onion staff to delay Snodgrass's progress. He also said that he had never instructed Red Onion staff to refuse to give Snodgrass complaint or grievance forms.

Gallihar stated that Snodgrass's participation in the Red Onion grievance procedure did not affect his progression in the Step-Down Program.  Instead, he testified that Snodgrass's progression through the program was based on Snodgrass remaining charge free, his programming compliance and meeting the required behavior goals. Gallihar stated that he based his decisions regarding Snodgrass's progression on his disciplinary charges and his weekly Status Chart reviews.

Gallihar testified that the status of every inmate held in segregation at Red Onion is reviewed each month by staff. He also stated that every Red Onion inmate

held in segregation has an ICA review conducted every 90 days. While Gallihar admitted that Snodgrass may not have ever received a "seg. qualifier" charge, he stated that he believed that Snodgrass properly was placed in segregation because he considered Snodgrass a threat to the orderly operation of the prison.

Gallihar stated that he had the authority in his position to give final approval to an inmate being retained in segregation, but that he had no authority to give final approval for an inmate to be placed in segregation originally. Gallihar stated that Snodgrass was placed at a security level S in 2013. He said that Snodgrass advanced to Phase II, level 6 of the program before he received disciplinary charges for possession of an intoxicant, disobeying a direct order and two counts of threatening bodily harm. As a result, Gallihar said, Snodgrass was demoted from Phase II, level 6 to SM-0 status. He stated that it was not required that an inmate be convicted or charged with a "seg. qualifier" before being demoted to SM-0 status. Gallihar stated that Phase II, level 6 was part of the Step-Down Program and to move an inmate from that level back to SM-0 status required the approval of the Warden only.

Defendant Gilbert also testified at the July 2018 trial. Gilbert stated that he was a corrections lieutenant who had worked as the Red Onion Operations Supervisor for the previous year and a half. Before that, he said that he worked as the corrections lieutenant in the C Building at Red Onion where the Step-Down Program was located from December 2015 through the end of 2016. Gilbert said that all SM, Special Management, and IM, Intensive Management, offenders were held in the C Building at Red Onion. Gilbert said that IM status offenders were the more violent of the two classes of offenders. When an inmate progressed to level 6, the inmate was transferred to the D Building.

Gilbert specifically denied that he ever told Snodgrass not to file complaints or grievances.  He also specifically denied that he ever told Snodgrass that his progression in the Step-Down Program would be delayed if he filed complaints or grievances.  He also specifically denied that he had ever threatened Snodgrass that he would find a way to house Snodgrass as an IM offender "if he kept this shit up." Gilbert testified that to change an inmate's status from SM to IM would require the approval of an external review team from outside of Red Onion. He said that he had never heard any Red Onion employee threaten Snodgrass and that he had never denied Snodgrass's requests for complaint or grievance forms.

Gilbert admitted that he did respond to the informal complaints of the inmates housed in the C Building when he was the corrections lieutenant of the building.  He said that he responded to between 15 and 20 informal complaints a week. Gilbert testified that Snodgrass's filing of complaints did not affect his progression through the Step-Down Program. Gilbert testified that an inmate's progression in the Step-Down Program depended upon completing the Challenge Series workbooks, meeting behavioral goals and remaining free of infractions.  Gilbert also testified that any decision he made regarding Snodgrass's ICA hearings were decided based on VDOC policy and were not affected by Snodgrass's filing of complaints and grievances.

Defendant Stewart also testified at the July 2018 trial. Stewart testified that she worked as a counselor at Red Onion for the two years prior to her leaving VDOC employment in August 2016. Stewart testified that she was never Snodgrass's counselor,  but she said that she did advise him on occasion during ICA hearings. In this role, she said that she would inform an offender what could be done to improve his status. She stated that, as a counselor, she did not conduct ICA hearings, but she

would produce VDOC documents for and take notes during the hearings.   The documents would include 48-hour notices of the ICA hearings served on inmates. She said that, at these ICA hearings, the inmate, herself and the lieutenant would often discuss the decision, but she said that she had no authority to overturn the lieutenant's decision as ICA.

Stewart denied that she had ever threatened to file fake charges against Snodgrass if he continued to file complaints.   She also denied that any of her decisions regarding Snodgrass were affected by his participation in the prison grievance procedure. Stewart said that she does not recall ever being present during an ICA hearing when Snodgrass asserted that he had not been given the Challenge Series workbooks.

## II. Analysis

The plaintiff in this case, Snodgrass, seeks damages[4] from the defendants based on his claims that the defendants conspired to delay his progress through the Step-Down Program in retaliation for his exercise of his First Amendment right to access the courts and to petition by filing informal complaints and grievances.   The Fourth Circuit has held that an inmate's right to be free from retaliation for accessing the courts also includes a right to be free from retaliation for accessing a prisoner grievance procedure. *See Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 544-46 (4th Cir. 2017). The plaintiff asserting a § 1983 claim has the burden of proof.   *See Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002). To recover damages under § 1983, a plaintiff must show (1) the conduct complained of was committed by a

---

[4] Snodgrass also sought injunctive relief, which is now moot.

person acting under color of state law, and (2) this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970). To establish §1983 liability, a plaintiff must affirmatively show that the "official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985) (citations and quotations omitted); *accord Garraghty v. Virginia,* 52 F.3d 1274, 1280 (4th Cir. 1995); *Wheeler v. Gilmore,* 998 F. Supp. 666, 668 n.5 (E.D. Va. 1998). Moreover, plaintiff may not avail himself of the doctrine of respondeat superior, as this doctrine is inapplicable to § 1983 claims. *See Wright,* 766 F.2d at 850. Thus, each named defendant must have had personal knowledge of and involvement in the alleged violations of plaintiff's constitutional rights for the action to proceed against them. *See Oliver*, 250 F. Supp. 2d at 598.

To prevail on a First Amendment retaliation claim under § 1983, a prison inmate must persuade the court that (1) he was engaged in protected First Amendment activity, (2) a defendant took some action that adversely affected the inmate's First Amendment rights, and (3) there was a causal relationship between the inmate's protected activity and the defendant's conduct. *See Martin v. Duffy,* 858 F.3d 239, 249 (4th Cir. 2017) ("*Martin I*"). It is well-established that the filing of a grievance or a lawsuit is protected First Amendment conduct that would satisfy the first element of a First Amendment retaliation claim under § 1983. *See Booker*, 855 F.3d at 541; *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). "With respect to the second element, the plaintiff is required to show that a defendant's allegedly retaliatory conduct caused 'more than a de minimis inconvenience' and that it 'would likely deter a person of ordinary firmness from the exercise of First Amendment Rights.'" *Wall v. Clarke*, 2023 WL 2703138, at *3 (W.D. Va. Mar. 29,

2023) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)).   Furthermore, the Fourth Circuit has recognized that placing an inmate in segregation can satisfy the second element of a retaliation claim. *See Martin I*, 858 F.3d at 250.

The third element of a retaliation claim requires the plaintiff to demonstrate that "there was a causal relationship between his protected activity and the defendant's conduct." *Martin I*, 858 F.3d at 249. In 2020, in *Martin v. Duffy*, the Fourth Circuit ruled that the burden-shifting framework set out in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), to evaluate causation in First Amendment retaliation claims in the employment context should be applied in reviewing prisoners' First Amendment retaliation claims. *See Martin v. Duffy*, 977 F.3d 294, 297, 299 (4th Cir. 2020) ("*Martin II*"). "That test allocates a prima facie burden to the plaintiff to show that his protected activity was 'a substantial or motivating factor' in the defendants' action." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (quoting *Martin II*, 977 F.3d at 301). "For a plaintiff to meet his prima facie burden of causation, he must show '(1) that the defendant[s were] aware of [his] engaging in protected activity' and (2) 'some degree of temporal proximity to suggest a causal connection.'" *Shaw*, 59 F.4th at 130-31 (quoting *Constantine*, 411 F.3d at 501). Conclusory assertions that a defendant acted with a retaliatory motive are not sufficient. *See Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). Also, the court should treat claims of retaliation "with skepticism because '[e]very act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams*, 40 F.3d at 74).   If the plaintiff presents a prima facie showing of causation, the burden then shifts to the defendants to prove by a preponderance of

the evidence that they would have taken the same action in the absence of the plaintiff's protected activity. *See Shaw*, 59 F.4th at 130.

Snodgrass claims that all of the defendants delayed his progress through the Step-Down Program in retaliation for filing a lawsuit against Raiford and Adams in this court in April 2015 and for providing declarations as evidence and testifying for inmate Donnell Blount in November 2015. Snodgrass also claims that defendants Gilbert, Gallihar and Stewart delayed his progress through the Step-Down Program in retaliation for his filing informal complaints and grievances. Regarding the first element of a First Amendment retaliation claim, Snodgrass has established that he engaged in protected First Amendment activity, in that he has provided evidence that he filed a lawsuit against Raiford and Adams in April 2015, he testified in another inmate's case in November 2015, and he filed Regular Grievances on December 27, 2015, (Docket Item No. 75-7 at 1), June 22, 2016, (Docket Item No. 75-10 at 2-3), and May 22, 2017, (Docket Item No. 76-15 at 1-3). Regarding the second element of a First Amendment retaliation claim, if placing an inmate in segregation establishes an adverse action, I hold that delaying or extending an inmate's stay in segregation, likewise, is "more than a de minimus inconvenience" that "would likely deter a person of ordinary firmness from the exercise of First Amendment Rights." *Constantine*, 411 F.3d at 500.

Next, I must determine whether Snodgrass has established that there was a delay or extension of his stay in segregation and whether he has established that each of the defendants was personally involved in that adverse action. The evidence before the court demonstrates that special management inmates such as Snodgrass were required to spend at least 90 days at each level of the Step-Down Program before being elevated to the next level. Snodgrass testified that he did not receive

any of the required Challenge Series workbooks from September until December 2015. He testified that when he received these workbooks, he finished the first two prior to being elevated to SM-1 status on March 2, 2016. Snodgrass also testified that he went 120 days at SM-1 status because he was not allowed to attend the classes necessary to complete the required workbooks for advancement until sometime in late July or early August 2016. Snodgrass testified that, even though he had completed the required workbooks, Gilbert, at an August 3, 2016, ICA review hearing, recommended that he remain in segregation at SM-1 status. Snodgrass stated he was elevated to SM-2 status in late August or September 2016 and demoted to SM-1 status again in December 2016 after being convicted of a disciplinary charge. Snodgrass stated that he completed the required workbooks and was elevated to SM-2 status in March 2017, and in June 2017, he was moved out of segregation into a structured living unit.

Duncan testified that Snodgrass was elevated to SM-1 status in February 2016, approximately 90 days after being designated at SM-0 status. Duncan agreed that Snodgrass was not elevated to SM-2 status until September 2016 and that he was demoted to SM-1 status again in December 2016 because he was convicted of a disciplinary charge. Duncan testified that Snodgrass was elevated to SM-2 status again approximately 90 days later in March 2017. At the time of the August 2017 trial, Snodgrass had progressed to Security Level 6, Phase I, and he was scheduled to graduate from the Step-Down Program, she said.  In her discovery responses, Duncan stated Snodgrass was assigned SM-0 status on November 2, 2015, advanced to SM-1 status on February 26, 2016, and advanced to SM-2 status on September 1, 2016. She stated that Snodgrass was demoted to SM-1 status on December 8, 2016, and advanced to SM-2 status again on April 6, 2017

From this evidence, I find that the only delays Snodgrass experienced in his progression through the Step-Down Program occurred during the period of February 26 to September 1, 2016, and when he was returned to SM-1 status in December 2016. While Snodgrass claims his progression was delayed when he was not provided the Challenge Series workbooks as soon as he was designated to SM-0 status, I am persuaded by Duncan's testimony that Snodgrass was elevated to SM-1 approximately 90 days after he was returned to SM-0 status in late 2015.

The next issue the court must determine is, which, if any, of the defendants took any action that adversely affected Snodgrass, in that the defendant personally participated in the delays in Snodgrass's progression through the Step-Down Program. Snodgrass claims his progression was delayed from February 26 to September 1, 2016, in part, because he was not allowed to attend the classes necessary to finish the Challenge Series workbooks required to progress to the next level until late July or early August 2016. The undisputed evidence before the court shows that it was the treatment officers' – Officers Walker's and Quillen's – duty to pull Snodgrass from his cell to attend these classes. Neither Walker nor Quillen is a defendant in this case, and Snodgrass has not persuaded the court that any of the named defendants were responsible for these officers not pulling him to attend the necessary classes. Snodgrass also testified that, after he completed the necessary classes and workbooks, he continued to be denied elevation to SM-2 status. He said he was told that he did not meet the required level of respect. Duncan's response to Snodgrass's Offender Request on August 4, 2016, shows that, as of this date, the reason Snodgrass was not progressing was his poor ratings in respect. (Plaintiff's Exhibit No. 11, Docket Item No. 75-11.) An ICA Hearing Report, (Plaintiff's Exhibit No. 12, Docket Item No. 75-12 at 2), also shows that on August 4, 2016, Gilbert recommended Snodgrass remain at the SM-1 level because he had "not met

all the requirements of the step down program." Duncan approved Snodgrass remaining at the SM-1 level on August 7, 2016, citing the same reasoning. The defendants also presented evidence that Gilbert recommended and Duncan approved Snodgrass remaining at SM-1 status in May 2016. (Defendants' Exhibit No. 2, Docket Item No. 76-2 at 22.) There was no evidence produced regarding who charged Snodgrass with the disciplinary offense which resulted in his return to SM-1 status in December 2016. While Gilbert stated that he might have placed the charge, he could not recall, and Snodgrass did not testify, as to whom placed the charge against him. Thus, the evidence before the court shows that the only defendants who participated in any way contributing to the delays in Snodgrass's progression were Duncan and Gilbert, and that delay occurred from at least August 4 to September 1, 2016.

In his testimony at the 2017 trial, Gallihar admitted that he had input in deciding to keep Snodgrass designated as a security level S from November 2015 to February 2016. He stated that, as Chief of Housing and Programs at Red Onion, he had final authority to approve an inmate being retained in segregation. Snodgrass, however, produced no evidence that Gallihar was personally involved in either the delay in his progression between February 26 and September 1, 2016, or Snodgrass's demotion to SM-1 status in December 2016. Evidence before the court shows that Gallihar, on multiple occasions, notified Snodgrass that he was not progressing because he was not meeting the required behavioral goal for respect. Nonetheless, there is no evidence before the court to show that Gallihar participated in assessing whether Snodgrass had met this behavioral goal.

There also is no evidence before the court showing that defendants Ponton, Still, Raiford, Swiney, Adams, Stewart, Hamilton, Kegley, Washington or Barksdale

had any personal involvement in assessing whether Snodgrass had met the behavioral goal for respect or that he should remain at the SM-1 level from February 26 to September 1, 2016. There also is no evidence that these defendants had any personal involvement in either charging Snodgrass with a disciplinary offense in December 2016 or deciding to demote Snodgrass to SM-1 status. While the evidence before the court does show that counselors such as Kegley and Stewart had input in deciding whether inmates in the Step-Down Program had met the behavioral goals, there is no evidence establishing who Snodgrass's counselor was from February 26 to September 1, 2016.[5] In fact, Stewart testified that she was not Snodgrass's counselor. Based on Plaintiff's Exhibit No. 1, (Docket Item No. 75-1), it appears K. Gibson, who is not a defendant, was Snodgrass's counselor as of May 24, 2016. Furthermore, as stated above, there can be no liability found against any of these defendants simply because they held a supervisory position, in that the doctrine of respondeat superior is not applicable in a §1983 claim. *See Wright,* 766 F.2d at 850. Since no evidence was presented with regard to these defendants, I will find in favor of these defendants on Snodgrass's claims.

The court next must address whether there was a causal relationship between Snodgrass's protected activity and the conduct of Duncan and/or Gilbert. *See Martin I,* 858 F.3d at 249. For Snodgrass to meet his prima facie burden of causation, he must show (1) that Duncan and Gilbert were aware of his engaging in protected activity and (2) some degree of temporal proximity between the protected activity and the adverse action to suggest a causal connection. *See Shaw,* 59 F.4th at 130-31; *Ofori v. Fleming*, 2021 WL 4462922, at *3 (W.D. Va. Sept. 29, 2021). Here, the protected activity is Snodgrass filing suit against Red Onion employees Raiford and

---

[5] Duncan testified that she was Snodgrass's counselor prior to February 25, 2016.

Adams in April 2015 and testifying for Blount in November 2015. He also has filed various Informal Complaints and Grievances. I find that neither of these protected activities has the degree of temporal proximity to establish a prima facie case of causation. Again, the issue is the delay in Snodgrass's progression from August 4 to September 1, 2016, and his demotion to SM-1 status in December 2016. The only evidence of protected activity occurring in close proximity to these actions is a Regular Grievance Snodgrass filed prior to June 6, 2016, complaining that he was not being pulled to attend the classes necessary to complete the Challenge Series workbooks.[6] There is no evidence before the court that either Duncan or Gilbert was aware of this Regular Grievance.

Based on the above, I cannot find that Snodgrass has established a prima facie case of causation under *Martin II* to shift the burden to the defendants. Even if the court were to find that Snodgrass has established a prima facie case of causation, I find that the defendants have met their burden by a preponderance of the evidence to show that they would have taken the same action in the absence of the plaintiff's protected activity.  Both Gilbert and Duncan testified that they did not delay Snodgrass's progression through the Step-Down Program in retaliation for either filing lawsuits or grievances. Gilbert testified that an inmate's progression through the Step-Down Program depended upon completing the required workbooks, meeting behavioral goals and remaining charge free. Duncan testified that Snodgrass's progression was delayed because he had poor ratings in meeting the

---

[6] Snodgrass also introduced into evidence a Regular Grievance dated February 28, 2016, challenging an ICA Hearing on January 29, 2016, at which it was determined he should remain at SM-0 status. (Plaintiff's Exhibit No. 9, Docket Item No. 75-9 at 4.) There is no evidence that this Regular Grievance was properly filed by Snodgrass. There is no evidence that anyone ever responded to this Regular Grievance or that either Duncan or Gilbert had knowledge of this Regular Grievance.

behavioral goal of respect. Duncan testified this was due, at least in part, to Snodgrass's obsessive use of profanity, which was viewed by staff as disrespectful – an allegation Snodgrass never denied. The Offender Request form submitted at Plaintiff's Exhibit No. 11, (Docket Item No. 75-11), supports this.

Gallihar also testified that Snodgrass's progression through the Step-Down Program was based on him remaining charge free and his meeting required programming and behavioral goals. Gallihar's testimony also supports that the delay in Snodgrass's progression was due to his failure to meet the required levels of respect.

I find the defendants' testimony credible, in part, due to the inconsistencies in Snodgrass's own testimony. For example, despite Snodgrass's testimony at one point claiming that no one would tell him why his reviews were not good, Snodgrass, himself, also testified that Gallihar, on at least one occasion, told him that he was not meeting the level of respect required to advance.  Nonetheless, at his 2018 trial, Snodgrass testified that Gilbert and Gallihar repeatedly told him he was not meeting the required level of respect. Also, Snodgrass's inmate witness, Roberts, testified that he overheard Gallihar tell Snodgrass numerous times that he was not meeting the required level of respect to advance. Duncan also testified that she had spoken to Snodgrass about his need for improvement in the area of respect.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings and conclusions:

1.      The defendants were acting under color of state law;

2.      Snodgrass engaged in protected First Amendment activity;

3.      Snodgrass experienced adverse actions, in that he experienced delays in his progression through the Step-Down Program from February 26 to September 1, 2016, and in December 2016;

4.      Snodgrass failed to establish that any of the defendants acted personally in his demotion to SM-1 status in December 2016 or in the delay in his progression through the Step-Down Program from February 26 through July 2016;

5.      Snodgrass failed to establish that any of the following defendants acted personally in the delay of his progression through the Step-Down Program from the end of July through September 1, 2016 – Kegley, Raiford, Swiney, Adams, Barksdale, Hamilton, Washington, Still, Gallihar, Ponton and Stewart;

6.      Snodgrass failed to establish a prima facie case of causation, in that the only evidence of protected activity occurring in close proximity to his delay through the Step-Down Program from the end of July through September 1, 2016, is a Regular Grievance Snodgrass filed prior to June 6, 2016, and Snodgrass failed to establish that either Duncan or Gilbert had any knowledge of this protected activity; and

7.      Even if the court were to have found that Snodgrass established a prima facie case of causation, the defendants Duncan and Gilbert have met their burden by a preponderance of the evidence to show that they would have taken the same action in the absence of the plaintiff's protected activity.

## CONCLUSION

Based on the above-stated reasons, I find in favor of the defendants and will enter judgment in their favor.

**ENTERED:** March 26, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE